COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-061-CV

 

 

IN THE
INTEREST OF R.R., JR. AND

V.R., CHILDREN

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                          I.  INTRODUCTION








Mother and Father appeal from a judgment
terminating their parental rights to R.R. and V.R.  Mother asserts as her sole issue, ADoes the
Indian Child Welfare Act [AICWA@ or Athe Act@] apply
to this case?@ 
Father raises two issues:  in his
first issue, he challenges the factual sufficiency of the evidence to support
the finding that termination of his parental rights was in the best interest of
R.R. and V.R., and in his second issue, he argues that the trial court erred by
not granting a new trial in light of evidence that the ICWA may apply.  We will overrule Father=s first
issue.  Because, according to published
guidelines that we are to give great weight to, the trial court here had reason
to know that Indian children were involved, specific statutory notices
containing specific statutorily defined information were required to be sent to
specific individuals.  Although the Texas
Department of Family and Protective Services (ATDFPS@) sent
out notices, those notices did not comply with the statutory requisites.  Accordingly, we will abate this appeal and
remand this case to the trial court so that proper notice may be provided to
the proper individuals and so that, after such notice, the trial court may
conduct a hearing and make a determination as to whether R.R. and V.R. are
Indian children under the ICWA.

                               II.  THE INDIAN CHILD WELFARE ACT

                    A.  Purposes and Relevant Provisions of the Act








Congress enacted the ICWA in 1978.  Indian Child Welfare Act of 1978, 25 U.S.C.A.
'' 1901B63
(2001).  The federal legislation was
passed in response to the Arising
concern in the mid-1970=s over the consequences to
Indian children, Indian families, and Indian tribes of abusive child welfare
practices that resulted in the separation of large numbers of Indian children
from their families and tribes through adoption or foster care placement,
usually in non-Indian homes.@  Miss. Band of Choctaw Indians v. Holyfield,
490 U.S. 30, 32, 109 S. Ct. 1597, 1599B1600
(1989); see also In re W.D.H., 43 S.W.3d 30, 34 (Tex. App.CHouston
[14th Dist.] 2001, pet. denied).  The ICWA
applies to all state child custody proceedings involving an Indian child when
the court knows or has reason to know an Indian child is involved.  25 U.S.C.A. ' 1912(a);
Doty-Jabbaar v. Dallas County Child Protective Servs., 19 S.W.3d 870,
874 (Tex. App.CDallas 2000, pet. denied).  And an Indian child is defined by the Act as
an Aunmarried
person who is under age eighteen and is either (a) a member of an Indian tribe
or (b) is eligible for membership in an Indian tribe and is the biological
child of a member of an Indian tribe.@  25 U.S.C.A. ' 1903(4).








The ICWA provides a variety of procedural and
substantive protections in child custody proceedings involving an Indian
child.  It sets out minimum requirements
with which a state court must comply before terminating parental rights in a case
involving an Indian child.  See id. ' 1912; Doty-Jabbaar,
19 S.W.3d at 874.  No termination of
parental rights may be ordered in such proceeding in the absence of a
determination, supported by evidence beyond a reasonable doubt, including
testimony of a qualified expert witness, that the continued custody of the
child by the parent or Indian custodian is likely to result in serious
emotional or physical damage to the child. 
See 25 U.S.C.A. '
1912(f).  Additionally, the tribe is
entitled to notice of a custody proceeding involving an Indian child and has
the right to intervene at any stage of the proceedings.  See id. ' 1912(a)
(notice), ' 1911(c) (intervention).  But the tribe=s
failure to intervene does not mean that the ICWA does not apply; the ICWA
applies when an Indian child is involved regardless of the tribe=s
participation in the proceeding.  W.D.H.,
43 S.W.3d at 34; Doty-Jabbaar, 19 S.W.3d at 874.

                B.  Membership or Eligibility for Membership in a
Tribe

Although the Act defines an Indian child as an Aunmarried
person who is under age eighteen and is either (a) a member of an Indian tribe
or (b) is eligible for membership in an Indian tribe and is the biological
child of a member of an Indian tribe,@ the Act
does not define what constitutes being a Amember@ or what
constitutes being Aeligible for membership.@  See 25 U.S.C.A. ' 1903(4).








Case law makes it clear, however, that enrollment
in a tribe or registration with a tribe is not the only way to establish
membership.  See, e.g., In re H.D.,
11 Kan. App. 2d 531, 535B36, 729 P.2d 1234, 1238 (Ct.
App. 1986).  Under the ICWA, enrollment
is not a necessary condition of tribal membership.  Nelson v. Hunter, 132 Or. App. 361,
364, 888 P.2d 124, 125B26 (Ct. App. 1995).  A[M]embership
may be established through proof of enrollment[;] enrollment is not the
exclusive test of membership.@  Id.[1]  AEnrollment
is not always required in order to be a member of a tribe.  Some tribes do not have written rolls.  Others have rolls that list only persons that
were members as of a certain date.@  Id., 888 P.2d at 125; accord In re
Junious M., 144 Cal. App. 3d 786, 791, 193 Cal. Rptr. 40, 42B43
(Dist. Ct. App. 1983).  Likewise, the
ICWA contains no blood quantum requirement; rather, each tribe has its own
criteria.  See Thomas R. Myers
& Jonathan J. Siebers, ICWA: 
Myths and Mistaken Application, 83 Mich. Bar. J. 12, 21 (2004).








The ICWA=s
failure to provide any statutory definition of the term Amember
of an Indian tribe@ or of the term Aeligible
for membership@ renders the ICWA ambiguous or
unclear on exactly how membership or eligibility for membership is to be
determined, especially in the absence of enrollment in or registration with a
tribe.  But following the enactment of
the ICWA, the Department of the Interior issued guidelines for state courts in
Indian child custody proceedings.  See
Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody
Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979) (hereinafter referred to as @Guidelines@).[2]  These Guidelines were not intended to have
binding legislative effect.  See id.  But construction of a statute by the
executive department charged with its administration is entitled to great
weight.  See Tex. Gov=t Code
Ann. ' 311.023(6)
(Vernon 2005); SWZ, Inc. v. Bd. of Adjustment of City of Fort Worth, 985
S.W.2d 268, 270 (Tex. App.CFort
Worth 1999, pet. denied); see also Stanford v. Butler, 142 Tex. 692,
700, 181 S.W.2d 269, 273 (1944) (observing that courts will ordinarily adopt
and uphold a construction placed upon a statute by a department charged with
its administration if the statute is ambiguous or uncertain, and the
construction is reasonable); Tex. Ass'n of Long Distance Tel. Cos. v. Pub.
Util. Comm'n of Tex., 798 S.W.2d 875, 884 (Tex. App.CAustin
1990, writ denied) (same).  Following
courts from other jurisdictions, at least one Texas court has looked to the
Guidelines in construing an undefined term in the Act.  See Yavapai-Apache Tribe v. Mejia, 906
S.W.2d 152, 163B64 (Tex. App.CHouston
[14th Dist.] 1995, orig. proceeding) (utilizing ICWA Guidelines to construe
undefined termCAgood
cause@Cin
ICWA); see also Junious M., 144 Cal. App. 3d at 793B94, 193
Cal. Rptr. at 43B44 (utilizing Guidelines to
construe undefined term Amember@ in
ICWA); H.D., 11 Kan. App. 2d at 533B36, 729
P.2d at 1237B39 (utilizing Guidelines to
determine when and under what circumstances tribal notice and opportunity to be
heard exist).








Thus, we next examine the Guidelines for
instruction on how membership or eligibility for membership in a tribe is to be
determined absent enrollment or registration in a tribe.  The Guidelines begin by recognizing that
there is a preference for keeping Indian children with their families or with
other Indian families and for deferring to tribal judgment on matters
concerning custody of tribal children. 
BIA Guidelines for State Courts; Indian Child Custody Proceedings, 44
Fed. Reg. at 67,586.  The Guidelines
state that A[p]roceedings in state courts
involving the custody of Indian children shall follow strict procedures and
meet stringent requirements to justify any result in an individual case
contrary to these preferences.@  Id. 
The Act and all regulations, guidelines, and state statutes relating to
it Ashall be
liberally construed in favor of a result that is consistent with these
preferences.  Any ambiguities in any of
such statutes, regulations, rules, or guidelines shall be resolved in favor of
the result that is most consistent with these preferences.@  Id.

The Guidelines provide specific instructions on
how to determine the status of an alleged Indian child:

When a state court has
reason to believe a child involved in a child custody proceeding is an Indian,
the court shall seek verification of the child=s status from either the
Bureau of Indian Affairs or the child=s tribe.

 

. . . .

 

The determination by a
tribe that a child is or is not a member of that tribe, is or is not eligible
for membership in that tribe, or that the biological parent is or is not a
member of that tribe is conclusive.








. . . .

 

Circumstances under which
a state court has reason to believe a child involved in a child custody
proceeding is an Indian include . . . (i)  Any party to the case . . . informs the court
that the child is an Indian child. . . . 
(ii)  Any public or state-licensed
agency involved in child protection services or family support has discovered
information which suggests that the child is an Indian child.

 

. . . .

 

In any involuntary child
custody proceeding, the state court shall make inquiries to determine if
the child involved is a member of an Indian tribe or if a parent of the child
is a member of an Indian tribe and the child is eligible for membership in an
Indian tribe.

 








Id. at 67,586 (emphasis added).  The commentary to this section of the
Guidelines, which is titled AB.1.
Determination That Child Is an Indian,@
instructs that A[t]his guideline makes clear
that the best source of information on whether a particular child is Indian is
the tribe itself.  It is the tribe=s
prerogative to determine membership criteria.@  Id.; see In re Adoption of Riffle,
273 Mont. 237, 242, 902 P.2d 542, 545 (1995) (recognizing that the tribe is the
ultimate authority on eligibility for tribal membership and the tribe=s
determination is conclusive); see also Junious M., 144 Cal. App.
3d at 788, 193 Cal. Rptr. at 40 (same). 
The commentary further provides that A[a]lthough
tribal verification is preferred, a court may want to seek verification from
the BIA [Bureau of Indian Affairs] in certain circumstances.@  BIA Guidelines for State Courts; Indian Child
Custody Proceedings, 44 Fed. Reg. at 67,586.

The commentary to section B.1. of the Guidelines
also indicates that it is the trial court=s and
the petitioner=s burden to make inquiry
sufficient to affirmatively determine whether the child is an Indian or
not.  The commentary explains, 

The guidelines also list
several circumstances which shall trigger an inquiry by the court and
petitioners to determine whether a child is an Indian for purposes of this
Act.  This listing is not intended to be
complete, but it does list the most common circumstances giving rise to a
reasonable belief that a child may be an Indian.

 

Id. (emphasis added).

Thus, according to the Guidelines, membership is
to be determined by the tribe, and the trial court and the petitioner (as
evidenced by the Guidelines= use of
mandatory Ashall@
language in three places) are to make inquiries to resolve the issue of whether
the child is an Indian when the trial court has reason to believe that the
child is an Indian because any party says he is or because a state-licensed
agency involved in child protection services has discovered information which
suggests that the child is an Indian child. 
See id.

                                     C.  AINQUIRY@ AND NOTICE








The exact inquiry that the trial courtCor here
TDFPS on behalf of the trial courtCis
required to make is set forth in section 23.11 of volume 25 of the Code of
Federal Regulations.  25 C.F.R. ' 23.11
(2008).  That section is titled, ANotice
of Involuntary Child Custody Proceedings and Payment for Appointed Counsel in
State Courts.@ 
Id.  It provides, in
pertinent part:

(a) In any involuntary
proceeding in a state court where the court knows or has reason to know that an
Indian child is involved, and where the identity and location of the child=s Indian parents or
custodians or tribe is known, the party seeking . . . termination of parental
rights to [] an Indian child shall directly notify the Indian parents . . . and
the child=s tribe by certified mail
with return receipt requested, of the pending proceedings and of their right of
intervention.  Notice shall include
requisite information identified at paragraphs (d)(1) through (4) and (e)(1)
through (6) of this section, consistent with the confidentiality requirement in
paragraph (e)(7) of this section.  Copies
of these notices shall be sent to the Secretary and the appropriate Area
Director listed in paragraphs (c)(1) through (12) of this section.

 

(b) If the identity or
location of the Indian parents, Indian custodians or the child=s tribe cannot be
determined, notice of the pendency of any involuntary child custody proceeding
involving an Indian child in a state court shall be sent by certified mail with
return receipt requested to the appropriate Area Director listed in paragraphs
(c)(1) through (12) of this section.  In
order to establish tribal identity, it is necessary to provide as much
information as is known on the Indian child=s direct lineal ancestors including, but not
limited to, the information delineated at paragraph (d)(1) through (4) of this
section.

 

Id.  Thus,
under either of these subsectionsCthat is
whether the identity and location of the child=s tribe
is known or unknownCthe notice is to include the
information delineated in paragraph (d)(1)B(4).  Id.








Section 23.11, paragraph (d)(1) through (4)
requires that the notice include the name of the Indian child, the child=s
birthdate and birthplace, the name of the Indian tribe(s) in which the child is
enrolled or may be eligible for enrollment, Aall
names known, and current and former addresses of the Indian child=s
biological mother, biological father, maternal and paternal grandparents and
great grandparents . . . including maiden, married and former names or aliases;
birthdates; places of birth and death; tribal enrollment numbers and/or other
identifying information.@  Id. '
23.11(d)(1)B(4).  Likewise, whether the identity and location
of the child=s tribe is known or unknown,
notice is required to be sent to the Aappropriate
Area Director.@  Id. '
23.11(a), (b).  For proceedings in Texas
(except for proceedings in the Texas counties of El Paso and Hudspeth), the
notice is to be sent to AAnadarko Area Director, Bureau
of Indian Affairs, P.O. Box 368, Anadarko, Oklahoma 73005.@  Id. ' 23.11(c)(4).  The notice is to include Athe
location, mailing address, and telephone number of the court and all parties
notified pursuant to this section.@  Id. '
23.11(e)(4).

A copy of the petition, complaint, or other
document by which the proceeding was initiated is to be attached to the notice.
 Id. ' 23.11(d)(4).  The notice is also required to include other
criteria, all of which are set forth in the statute.  See id. ' 23.11.








When a copy of the notice is served on the
Secretary of the Interior, his designee 

shall make reasonable
documented efforts to locate and notify the child=s tribe . . . .  The Secretary or his/her designee shall have
15 days, after receipt of the notice from the persons initiating the
proceedings, to notify the child=s tribe . . . . 
If within the 15-day time period the Secretary or his/her designee is
unable to verify that the child meets the criteria of an Indian child as
defined in 25 U.S.C. 1903, . . . the Secretary or his/her designee shall so
inform the court prior to initiation of the proceedings and state how much more
time, if any, will be needed to complete the search.

 

See id. ' 23.11(f).

                                      D.  THE PRESENT FACTS

In the present case, the Assistant District
Attorney who prosecuted the termination suit sent out four notices; two
concerning R.R. were filed with the court on September 19, 2007, and two naming
both R.R. and V.R. as the children subject to the termination suit were filed
during trial on February 13, 2008.  Two
of the four notices were labeled as directed to Athe
Kiowa Indian Nation,@ and two were labeled as
directed to AThe Secretary of the United
States Department of the Interior.@  But all four notices were mailed only to Mr.
David Anderson, Assistant Secretary For Indian Affairs, and to Mother, Father,
and the court-appointed attorney for R.R. and V.R.  None of the notices were mailed to the Area
Director, and none of the notices were mailed by certified mail or by
registered mail.








All four of the notices disclosed that a parental
termination suit had been filed concerning R.R. (or R.R. and V.R.) and stated
that Mother was allegedly an Indian as defined in the ICWA and that R.R. (or
R.R. and V.R.) were allegedly Indian children under the ICWA.  The notices directed to the Kiowa Nation
stated that A[t]he child [R.R. (or R.R. and
V.R.)] who is the subject of this proceeding is believed to be a member of or
eligible for membership in a federally recognized Indian tribe.@  The notices directed to the Secretary of the
United States Department of InteriorCbut not
the notices directed to the Kiowa NationCstated
that AMaternal
Grandmother MINNIE MARIE AUNIQUE (aka AUNQUE, AUNEQUE), alleges to be a member
of the KIOWA INDIAN NATION, in OKLAHOMA.@








The termination suit concerning R.R. and V.R. was
called to trial on February 5, 2008.  At
the conclusion of testimony on February 5, the trial court indicated that the
trial would be resumed and completed on February 13, 2008.  On February 13, 2008, at 9:30 a.m., the trial
court resumed the termination trial.  On
February 13, 2008 at 11:58 a.m., in addition to filing two of the four notices
mentioned above, the Assistant District Attorney filed a document that appears
to be a single-page form apparently filled out by the Kiowa Tribe of Oklahoma
Indian Child Welfare program.[3]

The form is addressed to AEnrollment
Department@ and is from AIndian
Child Welfare Program,@ specifically S. Ahtone.  The subject referenced in the memo-type form
is AMinors
certificate of degree of Indian blood (C.D.I.B.) &/or statement of
eligibility for enrollment.@  The form states that A[t]he
Child Welfare Program is requesting the following: Child(ren) and Family Tribal
Background Report.@ 
The form specifically names R.R., V.R., and Mother.  At the bottom of the form, in the AComments@ section
under the heading AEligible for Enrollment: (
)YES    ( ) NO,@ the
enrollment officer has written, A[N]eed
more info, probably under blood quantum,@ above
his/her illegible signature.  At the
bottom of the request, in the same handwriting as the children=s and
mother=s names
filled in on the form, is AMaternal
grandmother Minnie Marie Anque.@  The enrollment officer wrote under this
comment, AK00416 2 Kiowa,@
apparently indicating that Mother=s
mother, Minnie Marie Anque, was one-half Kiowa. 








The trial court did not apply the ICWA at trial.[4]  Mother filed a motion for new trial asserting
that the ICWA applied and testified at the hearing on the motion concerning her
alleged Kiowa ancestry.  At the motion
for new trial hearing, Mother testified, in pertinent part, as follows:

Q.  And is
your mother Minnie Marie Anqe [sic]?

A.  Yes,
sir.

Q.  And was
she a member of the Kiowa Indian tribe?

A.  Yes,
sir.

Q.  A
registered member?

A.  Yes.

Q.  And do you know whether you=re a registered member of
the Kiowa Indian tribe?

 

A.  I=m supposedly a member of it because I=m Indian, but I don=t know nothing about
it.  Yes, sir.

 

Q.  Do you know whether the children, whether
they would be eligible members?








A.  Yes, sir, because me and my family is, they
should be at least a little bit.  Less
than half.  Probably about half.

 

. . . .

Q. [Mother], you said you=re an
eligible tribal member, is that correct?

A.  Yes, ma=am.

On cross-examination Mother testified:

Q.  Do you remember coming to this court during
the trial and telling the judge and everyone in this courtroom that your
mother, who is the maternal grandmother to your children, was a member of the
Kiowa Indian tribe?

 

A.  Yes.

Q.  And do
you remember when I asked you if you were a member of the Indian tribe?  Do you remember that question?

A.  Yes, ma=am.

Q.  And do you recall saying no, I am not a
member?  Do you recall saying that?

 

A.  No, ma=am, I
don=t.

Q.  Do you
recall saying that you knew that was something you needed to look into as to
the membership for the tribe?

A.  Yes, ma=am.

Q.  So you don=t know if you=re a member; you just know that you=re an eligible tribal
member because your mother was a member?

 

A. 
No.  What I had supposedly known -
-








[THE COURT]: I=m sorry.  Would you say that again?  I couldn=t understand you.

 

A.  What I supposedly found out, too, is that I
have an aunt down here.  She knows I=m eligible for being an
Indian, too, because that=s my mom=s sister, and I just
found out that she was here in Fort Worth.

 

Q.  Is it true that you=re eligible to be a
tribal member of the Kiowa Nation?

 

A.  Yes, ma=am.

Q.  Is that
true?

A.  Yes, ma=am.

 . . . .

Q.  Have you - - [Mother], have you ever registered
with the Kiowa Nation?  Yes or No.

 

A.  Yes, I
have.

Q.  When
did you do that?

A.  When I
was born.  They did that when I was
born.  I=m
Indian.

Q.  Okay. 
But you told this court that you were not a tribal member.

 

A.  No, ma=am, I
did not say that.  You guys misunderstood
that.  I had told you I=m
eligible and I=m a member of it, because my mom
- - on my mom=s side of the family is nothing
but Indian.

Q.  Okay.

A.  And I had told the judge that, too, and
everybody that was in the courtroom that day.








Q.  Okay. 
Your mother is a tribal member of the Kiowa Nation, is that correct?

 

A.  Yes.

Q.  Is she
alive or deceased?

A.  She=s
deceased.

Q.  Okay. 
And you think you=re a member - - today,
you think you=re a member because
someone registered you when you were a baby, is that right?

 

A.  Yes. 
Because I know, because they have to do that when you=re Indian.  When they know that your family on one side
of the family is an Indian that=s already registered, they have to register the
kids.

 

The trial court denied Mother=s and
Father=s
motions for new trial but found that Mother=s and
Father=s
appeals of the termination judgment were not frivolous.  Mother and Father perfected this appeal.

                     E.  Application of the Law to the Present Facts

Mother, in her first issue, claims that the ICWA
applies here.  Father, in his second
issue, claims that the trial court erred by not granting a new trial in light
of the evidence that the ICWA may apply. 
TDFPS argues that the ICWA does not apply; TDFPS=s brief
focuses on the issue of whether the trial court had reason to believe that R.R.
and V.R. were Indian children and argues that it did not.













TDFPS relies on five main cases for the
proposition that the trial court here had no reason to believe that the
children were Indian children.  We have
reviewed each of these cases and the facts in all of them are distinguishable
from the present facts.  See In re
R.M.W., 188 S.W.3d 831, 832 (Tex. App.CTexarkana
2006, no pet.) (failing to mention, recognize, or apply Guidelines); see
also In re Johanson, 156 Mich. App. 608, 613B14, 402
N.W.2d 13, 16 (Ct. App. 1986) (affirming direct appeal of termination order
when mother was not member of tribe prior to order and no evidence existed in
record that trial court had any reason to believe Indian children were
involved); In re Guardianship of J.O., 327 N.J. Super. 304, 316B17, 743
A.2d 341, 347 (Super. Ct. App. Div.) (holding attorney=s
reference to possibility of Indian ancestry during status conference
insufficient to provide trial court with reason to believe children were Indian
children when parties were provided with ample opportunity to pursue the issue
but did not), cert. denied, 165 N.J. 492 (2000) ; In re A.L.,
2001 ND 59, & 12, 623 N.W.2d 418, 422
(holding that when mother offered no evidence to suggest the children were
Indian children, but relied upon her counsel=s
statements, trial court had no reason to believe children were Indian
children); In re Arianna R.G., 2003 WI App 11, & 21, 259
Wis. 2d 563, & 21, 657 N.W.2d 363, & 21
(holding trial court did not have reason to believe children were Indian
children based solely on statements of attorney).

We decline to follow In re R.M.W. because
neither the trial court nor the appellate court in R.M.W. mentioned or
gave proper weight to the Guidelines. 
188 S.W.3d at 832.  Here, unlike
in the four other cases relied upon by TDFPS, in which the only evidence of the
children=s
possible Indian status came from arguments of counsel, there is evidence from
the tribe that the children=s
maternal grandmother was an enrolled member and an indication that the tribe
needed more information to determine whether R.R. and V.R. were members or were
eligible for membership.  And here,
unlike those four cases, the party seeking termination did give some type of
noticeCalthough
for the reasons discussed below it was defective.  And finally, here, according to the
Guidelines, the trial court did have reason to believe that R.R. and V.R. were
Indian children.








According to the Guidelines, the trial court here
had reason to believe that R.R. and V.R. are Indian children because a public
or state-licensed agency involved in child protection services or family
supportCTDFPSCdiscovered
informationCthat the children=s
maternal grandmother was alleged to be a member of the Kiowa Indian NationCthat
suggests that R.R. and V.R. are Indian children.  BIA Guidelines for State Courts; Indian Child
Custody Proceedings, 44 Fed. Reg. at 67,586. 
Once the state court had reason to believe that R.R. and V.R. were
Indian children, the notice provisions of the ICWA were triggered.  Id. (providing that when a state court
has reason to believe a child involved in a child custody proceeding is an
Indian, the court shall seek verification of the child=s status
from either the BIA or the child=s
tribe).  The inquiry is to contain
specific information, presumably to enable the tribe to make a determination on
whether the child is, in fact, a member of the tribe or is eligible for
membership in the tribe.  See 25
C.F.R. '
23.11(d)(1)B(4).

The notices sent in this case were deficient in
several respects.  They were not sent
certified mail, return receipt requested. 
See 25 U.S.C.A. ' 1912(a)
(requiring notice under the ICWA be provided by certified mail, return receipt
requested).  They did not contain R.R.=s and
V.R.=s ages,
birthdates, place of birth, Mother=s
current and former addresses, Mother=s
married and maiden name, or Mother=s
birthdate and place of birth.  See
25 C.F.R.  ' 23.11(d)(1)B(3)
(setting forth requirements to be included in notice and including these
items).  Additionally, the notices were
not mailed to the appropriate area director, AAnadarko
Area Director, Bureau of Indian Affairs, P.O. Box 368, Anadarko, Oklahoma
73005.@  Id. 
(requiring mailing to Area Director).  None of the notices included the telephone
number for Mother or Father.  Id. ' 23.11(e)(4)
(requiring phone numbers be provided).








Substantial compliance with these notice
provisions will not suffice.  See,
e.g., In re I.E.M., 233 Mich. App. 438, 448B49, 592
N.W.2d 751, 757 (Ct. App. 1999) (holding notice did not comply with the ICWA
when not sent by certified mail, return receipt requested, and holding
telephone calls did not satisfy notice requirement).  Instead, proper notice in compliance with the
ICWA and the statutory notice provisions is a prerequisite to a state court=s determination
of whether to apply the ICWA.  See,
e.g., In re C.H., 510 N.W.2d 119, 124 (S.D. 1993) (holding notice
provided to Choctaw Nation of Oklahoma not in compliance with the ICWA because
not mailed by certified mail, return receipt requested as required by the
Act).  Compliance with all of the ICWA
notice provisions is required to promote and to maintain stability in the
placement of children; it is preferable to err on the side of giving notice and
examining thoroughly whether the child is an Indian.  I.E.M., 233 Mich. App. at 447, 592
N.W.2d at 757 (quoting In re M.C.P., 153 Vt. 275, 289, 571 A.2d 627, 634B35
(1989)); see also In re J.W., 498 N.W.2d 417, 419 (Iowa Ct. App. 1993)
(recognizing that Ait would be irresponsible for
this court not to assure the [notice] provisions of the Act were followed@ based
on Aa
serious risk subsequent proceedings may be brought for invalidation of the
termination order under section 1914@), disapproved
on other grounds by In re N.N.E., 752 N.W.2d 1 (Iowa 2008).








Based on the incomplete information provided in
the notices here, the Kiowa Indian Nation apparently was unable to verify
whether R.R. and V.R. were members of the tribe or eligible for membership in
the tribe.  Instead, the tribe sent back
a document indicating that the children=s
grandmother was a registered member of the tribe by noting, AMaternal
grandmother Minnie Marie Anque . . . K00416 2 Kiowa,@ and
requesting more information to determine whether R.R. and V.R. were members or
were eligible for membership.  The
Assistant District Attorney conceded that the tribe had requested additional
information, stating, AI believe it states they need
more information.A 
Yet, the record does not reflect that any additional information was
provided to the tribe, that Mother and Father were provided a copy of the tribe=s
response, or that the tribe was provided Mother=s or
Father=s phone
number to contact them directly.

And although the Secretary of the Interior or his
designee was served, no copy of a notice sent by the Secretary of the Interior
to the Kiowa Nation was filed with the trial court.  See 25 C.F.R. '
23.11(f) (requiring the Secretary to send a copy of any notice provided to the
tribe to the court).  Additionally, the
Secretary did not inform the trial court here prior to the initiation of the
proceedings that he or his designee was unable to verify that R.R. and V.R.
meet the criteria of Indian children.  See
id.








A violation of the ICWA notice provisions may be
cause for invalidation of the termination proceedings at some later, distant
point in time.  See 25 U.S.C.A. ' 1914
(providing that A[a]ny Indian child who is the
subject of any action for . . . termination of parental rights under State law,
any parent . . . from whose custody such child was removed, and the Indian
child=s tribe may
petition any court of competent jurisdiction to invalidate such action upon a
showing that such action violated any provision of sections 1911, 1912, and
1913 of this title@); see also W.D.H., 43
S.W.3d at 38B39 (recognizing parent of Indian
child has standing to challenge adequacy of notice even though tribe declined
to join suit).  Consequently, because the
termination proceeding here will likely result ultimately in the adoption of
young R.R. and V.R., strict compliance with the notice provisions of the ICWA
and the regulations implementing it in the Code of Federal Regulations is
especially important, or Athe State could offer
prospective adoptive parents no assurance this termination and a subsequent
adoption would not be invalidated.@  See J.W., 498 N.W.2d at 419B22
(recognizing that notice provisions of the ICWA are to be strictly construed
and reversing order terminating parental rights because of inadequate notice
and remanding for new hearing after proper notice).













Whether the trial court correctly applied the
ICWA is a question of law.  See W.D.H.,
43 S.W.3d at 33; see also I.E.M., 233 Mich. App. at 443, 592 N.W.2d at
755 (holding that A[w]hether the probate court
failed to satisfy a notice obligation imposed by the ICWA involves a legal
question of statutory interpretation that we review de novo@).  Here, because under the Guidelines the trial
court had reason to know that R.R. and V.R. were Indian children, the notice
provisions of the ICWA were triggered.  See
BIA Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg.
at 67,586 (providing that A[w]hen a
state court has reason to believe a child involved in a child custody
proceeding is an Indian, the court shall seek verification of the child=s status@); see
also 25 C.F.R. ' 23.11(a)B(f)
(setting forth requisites of notices given under the ICWA).  Because the predicate of proper notice under
the ICWA was not satisfied here, the trial court could not resolve the issue of
whether R.R. and V.R. were Indian children without leaving its termination
decree open to subsequent challenge and invalidation by Mother, Father, the
tribe, R.R., or V.R.  See, e.g.,
25 U.S.C.A. ' 1914 (authorizing Aany
Indian child who is the subject of any action for . . . termination of parental
rights under State law, any parent . . . from whose custody such child was
removed, and the Indian child=s tribe
[to] petition any court of competent jurisdiction to invalidate such action
upon a showing that such action violated any provision of sections 1911, 1912,
and 1913 of this title@); Junious M., 144 Cal.
App. 3d at 791, 193 Cal. Rptr. at 42 (explaining that violation of the ICWA=s notice
provisions may be cause for invalidation of the proceedings).  Once proper notice is given in compliance
with the dictates of the ICWA, however, if the tribe fails to respond or
intervenes but fails to determine the child=s
membership or eligibility for membership in the tribe, then the burden shifts
to the parties to show that the ICWA applies. 
See I.E.M., 233 Mich. App. at 449, 592 N.W.2d at 757
(recognizing that neither Father nor tribe had responsibility to establish
applicability of the ICWA absent proper notice as dictated by the ICWA); In
re Baby Boy Doe, 123 Idaho 464, 470, 849 P.2d 925, 931 (explaining that,
if, after proper notice, the state court does not receive a conclusive
determination from the tribe or the BIA regarding a child=s
eligibility for tribal membership, the trial court must make its own
determination, and the burden of producing the necessary evidence on this issue
is on the party asserting the applicability of the ICWA), cert. denied,
510 U.S. 860 (1993).








Because, in the absence of proper notice any
determination of whether the children were Indian children was premature, we
sustain the portion of Mother=s first
issue claiming that the trial court erred in its determination of whether the
ICWA applied.  We likewise sustain the
portion of Father=s second issue complaining that
the trial court erred by not granting a new trial on the issue of whether R.R.
and V.R. were Indian children.  We need
not address the balance of Mother=s first
issue or of Father=s second issue.  See Tex. R. App. P. 47.1.

                                         F.  PROPER REMEDY

When an appellate court finds a violation of the
ICWA notice provisions, reversal is not necessarily warranted; instead, a court
may remand the case to the trial court so that proper notice may be
provided.  See Tex. R. App. P.
44.4.  The appellate court will
conditionally affirm the termination order in the event that, on remand, after
proper notice the children are determined to not be Indian children.  See, e.g., Junious M., 144 Cal.
App. 3d at 788, 193 Cal. Rptr. at 40 (indicating that the ICWA notice error
required a Aqualified reversal@); In
re R.E.K.F., 698 N.W.2d 147, 150 (Iowa 2005) (and cases cited therein); C.H.,
510 N.W.2d at 124 (holding that, when there is uncertainty as to whether the
ICWA applies and there is a notice defect, proper remedy is to remand for
proper notice and determination of whether children are Indian children).








We will follow these courts and utilize that
procedure here.  We will abate this
appeal and remand this case to the trial court. 
Proper notice that complies with the statutory notice requisites shall
be provided, and then the trial court shall conduct a hearing to determine
whether R.R. and V.R. are Indian children under the ICWA.  See Tex. R. App. P. 44.4 (providing
that appellate court shall not reverse or affirm judgment if trial court can
correct erroneous failure to act, and authorizing appellate court to direct
trial court to correct erroneous failure to act and to then proceed as if
erroneous failure to act had not occurred). 
After we receive the supplemental records generated by  the hearing in the trial courtCas set
forth in our abatement order issued concurrently with this opinionCthis
appeal will be reinstated.  If, after
proper notice and a hearing, the trial court has determined that R.R. and V.R.
are not Indian children, then we will issue a judgment affirming the trial
court=s
termination judgment.  See Tex. R.
App. P. 43.2(a).  If, after notice and
hearing, the trial court determines that R.R. and V.R. are Indian children,
then this court shall issue a judgment reversing the trial court=s
termination judgment, and the trial court shall conduct a new trial applying
the ICWA.  See Tex. R. App. P.
43.2(d).

           III.  FACTUAL SUFFICIENCY TO SUPPORT TRIAL COURT=S FINDINGS THAT

   TERMINATION OF FATHER=S PARENTAL RIGHTS IS IN R.R=S AND V.R.=S BEST INTERESTS

 

In his first issue, Father argues that the
evidence is factually insufficient to support the finding that termination of
his parental rights is in the best interest of the children.

                       A.  Facts Pertinent to Best Interest Analysis

                       1.  Father and Mother=s
Violent Relationship








Father and Mother met at the Presbyterian Night
Shelter and started living together approximately one year later.  They have been in an off-and-on relationship
for approximately four years.  Mother
testified that she has been physically assaulted by Father five or six times
since they have been together and that they both have anger management
issues.  Mother said that Father hit her
for the first time when she was four or five months=
pregnant with R.R.

                               2.  Police and CPS Involvement

                                           a.  July 2006

Jeannie Maxey, a CPS investigator, testified that
she received a referral on July 14, 2006, two days after R.R.=s
birth.  The referral stated that there
was domestic violence, a history of drug use by the parents, and financial
instability.








Maxey went to the family=s
residence to interview the parents and noted that the residence was clean and
appropriate.  At first, Mother said that
she and Father had only argued, but later Mother admitted that Father had hit
her before R.R. was born.  Mother also
admitted that she had been to a domestic violence shelter.  Mother told Maxey that she had used
methamphetamine in the past but had been clean for a few years[5]
and that Father had used crack and had been drug-free for one to two years.

When Maxey spoke with Father, he said that he had
a history of using crack and marijuana but had been clean for six months.  Father admitted that he had a criminal
history that included injury to a child.

Maxey testified that she did not remove R.R. at
that time.  Maxey, however, ruled the
case as Areason
to believe for neglectful supervision@ because
the parents were leaving R.R. with Father=s
mother, who had been diagnosed with schizophrenia and was unstable.  Maxey also opened a case for family-based
social services and recommended parenting classes and domestic violence
counseling for Mother and Father.

                                         b.  August 2006








In response to an allegation that Mother was
spanking R.R., Maxey again visited Mother and Father=s
residence on August 17, 2006.  While
Maxey was there, she witnessed an argument as Mother, Father, and Father=s mother
disputed whether Mother or Father had struck the first blow during a previous
domestic violence incident.  Mother told
Maxey that Father would be going to jail for a charge of injury to a family
member and that produced concern over the family=s
financial future.[6]  Mother and Father both told Maxey that
neither of them had spanked R.R.[7]

                                       c.  September 2006

Maxey received a second referral that Mother was
spanking R.R. and that Mother was still leaving him with Father=s mother.  Maxey testified that this referral was ARuled
Out,@ meaning
that there was no evidence to suggest that Mother was spanking R.R.  Mother, moreover, said that she would not leave
R.R. with Father=s mother again because she
understood that Father=s mother was not an appropriate
caretaker for R.R.

                                       d.  November 2006

Officer Billy Byers with the Fort Worth Police
Department testified that he went to Father and Mother=s
residence on November 8, 2006, in response to a domestic disturbance call.  When Officer Byers arrived, he noted that
Father was intoxicated.  Officer Byers
testified that the Abedrooms weren=t
liveable@ and
that one of the bedrooms Ahad a bunch of dogs in it.@  He further testified that








the baby was crying the
entire time we were there.  They had not
once checked on that child until I asked them to because the baby was
crying.  And the baby was laying in that
little cushion chair and they were just constantly arguing, yelling back and
forth, cursing at each other.  And this
was all three of them.  They were all
screaming at each other, as well as the police that had responded out there.

[Mother=s] action with taking the
child outside the house with the cold condition and giving the baby to her
obviously intoxicat[ed] husband and throwing, in fact -- or his words, throwing
the baby at him at the store.

It=s very unsafe for that
child to be in.  I=m not -- I don=t recall what the baby=s age was, but was only a
couple of months old.  Obviously, shouldn=t have been out in that
environment and should be looked after. 

 

Bethany Houser, who works for CPS, testified that
she received a referral on November 8, 2006. 
Houser said that the police had been called to the home twice on
November 7 for domestic violence and were concerned about the condition of the
home, the state of both parents, and R.R.=s safety
and well-being in the home.

When Houser arrived, Father appeared to be
intoxicated.  Mother admitted that she
had used drugs a couple of weeks before the night in question.  Houser also saw that Father=s mother
lived with the family and knew that she had significant mental health issues.








Houser noted that there was debris, trash,
clutter, and old bottles of spoiled formula throughout the residence; that
there were plates and pans with old food on them on the floor; that there was
dog feces primarily in the baby=s room;
and that there were many holes in the walls, doors were off hinges, and broken
framing existed around doors.  Even
though R.R. did not have any marks on him and revealed no signs of neglect
other than a slight rash, Houser decided that it was in the best interest to
remove R.R. on that date because she knew that there had been prior CPS cases
involving Father and Mother.

After R.R. was removed, CPS asked Father to take
a drug test.  In a drug test dated
November 15, 2006, Father tested positive for opiates. 

                                         e.  January 2007

Officer Jesus Alaniz with the Fort Worth Police
Department testified that a concerned citizen reported on January 6, 2007, that
a domestic disturbance was occurring in front of a Fiesta grocery store.  Mother said that she had pushed Father, and
Father said that Mother had hit him in the head.  Mother received a citation for the incident.








                                           f.  May 2007[8]

Officer Byers testified that he responded to
another domestic violence call at the residence in May 2007.  On that occasion, Mother had gotten into a
physical fight with Father=s
mother, who hit Mother while she was pregnant with V.R.  When police arrived, Father=s mother
made threats of killing Mother and the police. 
Officer Byers testified that Father=s mother
told them that she was schizophrenic and was on several medications for
psychiatric problems, which he knew from previous dealings with her.  Father=s mother
also told them that there were people in the attic and people under the stairs
that were coming to get her.  He felt
that she had severe Aissues with her coherency@ and
that it was Avery unsafe for anybody to be
around.@  Officer Byers further testified that he had
been to the residence three or four times within the past year and that it was
an unstable environment for a child.








                                          g.  June 2007

Officer Michael Sones with the Fort Worth Police
Department testified that he spoke with Mother in June 2007 and that she said
she had been in a domestic assault while she was pregnant with V.R.  Mother testified that Father had been
drinking and that he had dragged her out of the house, pushed her, and hit her
four times.

Officer Sones placed Father in the patrol car,
and Father kicked out the back window of the patrol car.  Father was charged with criminal mischief and
assault bodily injury to a family member. 
Officer Sones testified that Father=s lack
of self-control is dangerous for a child and that the parties had a history of
domestic violence.

                                        h.  October 2007

Due to safety issues regarding children being in
a home where domestic violence had occurred and was ongoing, CPS removed V.R.
at birth.  CPS placed V.R. with the same
foster family that was keeping her brother R.R. 

                                        i.  December 2007








Officer Dean Meza responded to a call at the
Presbyterian Night Shelter on December 25, 2007.  Father had reported that Mother, whom he
described as his fiancée, had assaulted him. 
Mother went to jail for the assault. 
Officer Meza testified that, according to Father, both Father and Mother
were living at the shelter.

                           3.  Father=s
Convictions and Bad Acts

Father admitted that he had been convicted of and
served time in the penitentiary for the offense of bodily injury to a child
that occurred on or about April 20, 1997. 
Father also admitted that he had been convicted of robbery causing
bodily injury and that prior to R.R.=s birth,
he had been convicted of DWI.

Father testified that he was convicted of assault
bodily injury to a family member (Mother) that occurred on or about February 8,
2006, while Mother was pregnant with R.R. 
Father explained that he had hit Mother in the face because he was mad
and intoxicated. 

Father discussed the facts underlying his June
2007 criminal mischief and assault bodily injury to a family member (Mother)
convictions.  Father admitted that he had
been drinking that night and that Mother was pregnant with V.R. and added that
Mother had assaulted him several times.








Father testified that on Christmas Day 2007, he
was living with his uncle and that he went to visit Mother at the Presbyterian
Night Shelter.  Father said that Mother
had assaulted him.  Father admitted that
he had pushed her back and stated that she had hit him once in the head and
several times on the side of the head. 
Father called the police at that point and again two hours later when
Mother pushed him again.

               4.  The Service Plan and Father=s
Compliance Therewith

                                   a.  From CPS=s
Standpoint

April Cumberbatch, who works with CPS, testified
that she explained the service plans to both Mother and Father.  Cumberbatch said that their service plans included
a psychological evaluation, domestic violence counseling, a mental health
assessment, and anger management.

Although Father signed his service plan,
Cumberbatch testified that Father had not completed any of the services on his
plan as of July 2007.  With regard to
Father=s
visitations, Cumberbatch testified that Father was appropriate during the
visits and seemed to have a good rapport with R.R.; however, Father=s visits
were inconsistent because he was in jail for physically assaulting Mother while
she was pregnant.








Elizabeth Bowlen, the ongoing CPS caseworker who
took over the case after Cumberbatch took a different job, testified that she
had given Father bus passes to use to attend his classes and visits but that he
had given them to a friend and was therefore not using them properly.  Bowlen said that Father did not make an
appointment for his psychological examination until November or December 2007,
at which time the office did not have an opening until January; the office then
stopped performing psychological evaluations.

Bowlen said that Father completed some services
on his plan:  parenting classes, anger
management classes, a substance abuse assessment, CATS classes, and individual
counseling.  Bowlen testified that,
despite Father=s completion of these classes,
she has not seen Father demonstrate what he has learned, though she admitted
that there had been no domestic violence incidents in the one month since
Father had completed the anger management classes.[9]  Bowlen also testified that Mother and Father=s
counselor said that he did not feel that they would be capable of parenting
children at this time and that he did not have positive things to say about
Mother and Father=s progress.








Bowlen testified that even if Father did not
marry Mother, he could not provide either of his children with a safe and
stable home as of the time of the termination trial.  Bowlen explained that the case had been ongoing
for fifteen months and that Father had not been able to establish a safe
environment for the children to live in; the one house that he had paid rent on
was deemed unsafe for the children to live in, and there was some testimony
that the family had lived in a tent on Father=s uncle=s
property at one point.  Bowlen, moreover,
expressed that she was unsure how steady Father=s jobs
were because he and Mother did not have enough money to pay for bus tickets.[10]

                                 b.  From Father=s
Standpoint

Father admitted that his current service plan was
similar to one that he was given in the summer or fall of 2006 and that
initially he did not work any of the services. 
Once Father began working his service plan, he gave a urinalysis and
completed parenting classes, twelve weeks of individual counseling, twelve
weeks of couples counseling, anger management classes, and the CATS program,
which is a drug and alcohol assessment.

Father admitted that he has an anger problem and
testified that Mother Ahas a lot of anger issues.@  Father admitted that he was taking anger
management classes when he kicked out the back window of the patrol car.  Father said that through his classes, he has
learned about self-control and about not Aoveraggressing@ when
someone offends him, and he is a better person today.  Father said that he knows that it is wrong to
hit Mother and that assaults do not create a safe environment for children.








Father admitted that he had not completed his
psychological evaluation. He said that he had tried to get a psychological
evaluation but that he had lost his job[11]
and did not have the money to get one before October 2007; then, when he tried
to get one, the facility had stopped doing psychological evaluations.  He also admitted that part of the reason he
had not completed his psychological evaluation was because he had Abeen in
and out of jail.@

Father testified that his mother is an
appropriate caregiver for his children: AShe=s
fine.  She thinks that she=s
mentally messed up, but she=s not.@  Father later testified, A[M]y mom=s crazy.@  Father admitted that his mother fights with
Mother and agreed that it would be dangerous if he, his mother, and Mother all
lived together.

With regard to the condition of the house in
2006, Father testified that they had a new dog and had left him in the house
all day and all night.  Father said that
the police officer had lied about the holes in the wall and the doors being off
the hinges because there were only two holes in a door.








Father testified that he had lived in three
places during the year before the trial and that he did not have a stable
environment at the time of trial; he lost his house because his landlord had
sold it.  At the time of the trial,
Father was living with his uncle, whom he described as a Adrug
head,@ but
Father did not have a steady place to house the children because he had not
asked his uncle if they could live with him.

                                     5.  Plans for the Future

                                         a.  Father=s Plans

Father=s
testimony regarding his plans for the children was somewhat confusing.  Father testified that he and Mother are going
to Alet
their relationship go@ because they want to get their
children back, but he later described Mother as his Asoon-to-be
wife.@  Father said that he did not want to
relinquish his parental rights; he said that they would have to be
terminated.  Father thereafter testified
that it would be in the best interest of the children to not be returned to
him, though he later contradicted himself by testifying that it would be in the
children=s best
interest to be placed with him because he would take care of them.








Father testified that Mother is a good mom to his
children and that they both care for the children.  Father testified that the children could be
placed with Mother and that he wants Mother to have a chance to raise the
children because he knows that she loves them and that they love her.  Father testified that he had saved $800 and
would financially support the children and Mother, who was living at the
shelter.  Father said that Mother could
have possession of the children because he wants to see the children raised
with one of their parents.  Father
proposed that the children would be kept safe by Mother going to church and not
taking them to places that children should not go.

When asked whether there were any relatives who
could take the children, Father testified that his children would be better off
in foster care than with one of his relatives because his family does not care.

                            b.  CPS=s
Recommendation and Plan

Cumberbatch testified that it was in R.R.=s best
interest to terminate Mother=s and
Father=s
parental rights.  Cumberbatch testified
that CPS=s plan
was for R.R. to be adopted by his foster parents.

Bowlen also testified that it was in the children=s best
interest to terminate Mother=s and
Father=s
parental rights and that the plan was for the children to be adopted by their
current foster family because the children need a safe, stable home, as well as
permanency and stability.  Bowlen said
that, in her opinion, Father currently cannot provide a safe environment for
the children.

                                  6.  Trial Court=s
Disposition








After hearing the above evidence, the trial court
found by clear and convincing evidence that Mother and Father knowingly placed
or knowingly allowed R.R. and V.R. to remain in conditions or surroundings
which endanger their physical or emotional well-being, engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endangered the physical or emotional well-being of the children, and that
termination of the parent-child relationship was in the children=s best
interest.  The trial court therefore
terminated the parent-child relationship between Mother and R.R. and V.R. and
between Father and R.R. and V.R.

                       B.  Burden of Proof and Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute, and
just as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that
emotional and physical interests of the child not be sacrificed merely to
preserve that right.@ 
In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, TDFPS seeks not just
to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2008); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear
and convincing evidence.  Tex. Fam. Code
Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ Id. ' 101.007
(Vernon 2002).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).








In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the termination of the parent-child relationship would be in the
best interest of the child.  C.H.,
89 S.W.3d at 28.  If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2008).  The following
factors should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:

(1) the child=s age and physical and
mental vulnerabilities;

 

(2) the frequency and nature of out‑of‑home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the child;








(4) whether the child has
been the victim of repeated harm after the initial report and intervention by
the department or other agency;

 

(5) whether the child is
fearful of living in or returning to the child=s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child=s parents, other family
members, or others who have access to the child=s home;

 

(7) whether there is a
history of abusive or assaultive conduct by the child=s family or others who
have access to the child=s home;

 

(8) whether there is a
history of substance abuse by the child=s family or others who have access to the child=s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness and
ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and
ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the child=s family demonstrates
adequate parenting skills, including providing the child and other children
under the family=s care with:

 

(A) minimally adequate health and nutritional care;

 

(B) care, nurturance, and
appropriate discipline consistent with the child=s physical and
psychological development;








(C) guidance and
supervision consistent with the child=s safety;

 

(D) a safe physical home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F) an understanding of
the child=s needs and capabilities;
and

 

(13) whether an adequate
social support system consisting of an extended family and friends is available
to the child.

 

Id. ' 263.307(b); R.R.,
209 S.W.3d at 116.

Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include (A) the desires of the child, (B) the emotional and physical
needs of the child now and in the future, (C) the emotional and physical danger
to the child now and in the future; (D) the parental abilities of the
individuals seeking custody, (E) the programs available to assist these
individuals to promote the best interest of the child, (F) the plans for the
child by these individuals or by the agency seeking custody, (G) the stability
of the home or proposed placement, (H) he acts or omissions of the parent which
may indicate that the existing parent‑child relationship is not a proper
one, and (I) any excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).








These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

                  C.  Termination Was in the Children=s Best
Interest

Because Father claims that factually insufficient
evidence exists to establish that termination of his parental rights are in the
children=s best
interest, we begin our analysis with the factors listed in family code section
263.307(b).

With regard to the first factor, the children
involved were very young at the time of the termination trial and were
therefore physically and mentally vulnerable.

Under the second factor, the record revealed that
CPS placed R.R. in a foster home and were able to place V.R. in the same foster
home when she was born; there is no evidence in the record that the children
were ever moved to another foster home or returned to their parents after they
were removed.








With regard to the third, fourth, and ninth
factors, Bowlen stated that prior to CPS=s
intervention, R.R. was exposed to many domestic violence incidents involving
Father, Mother, and Father=s
mother.

Due to the children=s young
ages, the record did not detail whether they would be fearful of returning to
their parents, but Bowlen testified that the foster mother is the only mother
figure V.R. has bonded with.

With regard to the sixth factor, the record did
not include psychiatric, psychological, or developmental evaluations of the
children.  However, the foster mother
testified that R.R. is developmentally delayed and is receiving speech
therapy.  The record also demonstrated
that Father=s mother, who lived with the
family, was unstable and suffered from mental health issues.  Father did not complete his psychological
evaluation, so it is not part of the record.

The record was replete with evidence of the
seventh and eighth factors.  As set forth
in detail above, Father and Mother engaged in domestic violence on numerous
occasions, resulting in law enforcement and CPS involvement.  Additionally, the record revealed that Father
had several convictions, including one for bodily injury to a child; that he
abused alcohol; and that he had previously used drugs.








With regard to the tenth and eleventh factors,
Father did not initially comply with his service plan.  At the time of the termination trial, Father
had completed most of the items on his service plan, but Bowlen testified that
he had failed to change his behavior.

The twelfth factorCwhether
the child=s family demonstrates adequate
parenting skillsCwas not put to the test because
R.R. and V.R. were removed when they were little and because Father was in and
out of jail during the time this case was pending.  But there was evidence that while Father and
Mother were fighting, they ignored R.R., who was crying the entire time the police
were at the residence in response to a domestic violence incident.  The record also revealed that Mother and
Father=s
counselor told the CPS worker that Mother and Father were not capable of
parenting children Aat this time.@
Additionally, Father did not have a safe physical home environment established
for the children as of the time of the termination trial.

Father testified regarding the final statutory
factor when he said that his children would be better off in foster care than
with his family because his family does not care.

Regarding the first Holley factor, the
children did not testify at trial. 
Although Father testified that both he and Mother care for the children,
the evidence revealed that both V.R. and R.R. are doing well in their foster
home and seem bonded to the foster parents.








Regarding the second factorCthe
children=s present
and future physical and emotional needsCthe
foster mother testified that R.R. is developmentally delayed and has tubes in
his ears due to recurrent ear infections that caused him moderate hearing
loss.  Bowlen mentioned that R.R. does
not talk much during the visits, and the foster mother testified that R.R. is
receiving speech therapy to address this. 

The third and eighth factorsCthe
emotional and physical danger to the child now and in the future and the acts
or omissions of the parent which may indicate that the existing parent-child
relationship is not a proper oneCwere at
the heart of this case.  The record
demonstrates that Father hit Mother during both of her pregnancies and that
Father and Mother=s domestic violence disputes
were ongoing through Christmas 2007, which was approximately six weeks prior to
the start of the termination trial.  As
mentioned above, R.R. was present during numerous domestic violence incidents
prior to his removal by CPS.  The record
also revealed that Father was in and out of jail during this case, leaving
MotherCwho also
had an anger management problemCto
parent R.R. and that Mother often left R.R. with Father=s
mother, whose mental health was often volatile. 
Moreover, the record contained evidence of unsafe and unstable housing.








Regarding the fourth factorCthe
parental abilities of the individuals seeking custodyCMother
testified that before R.R. was removed from their home, Father fed, bathed, and
diapered him and was involved in his life. 
Father testified that he had never hit the children.  Mother testified that Father is a great
father as long as he does not drink.

Concerning the fifth factor, Father attempted to
better himself by attending parenting classes, twelve weeks of individual
counseling, twelve weeks of couples counseling, anger management classes, and
the CATS program.  However, he failed to
undergo a psychological evaluation.

Regarding the parties= plans
for the childrenCthe sixth factorCFather=s plans
regarding his parental rights were confusing, but overall, he appeared to want
the children placed with Mother and said that he would financially support the
children and Mother.  Father admitted
that he did not have a stable home available to put the children in as of the
time of trial.

Mother testified that Father would be a good
father and would come and visit, but she is not sure that it would be a good
thing for him to visit because he likes to drink and because she did not Aknow how
his reactions would be.@ 
Mother said that she has concerns that Father would be drinking and not
taking care of the children.








Both Cumberbatch and Bowlen testified that CPS=s plan
was for the children to be adopted by their current foster family.

Regarding the stability of the proposed placementCthe
seventh factorCthe evidence demonstrated that
terminating Father=s parental rights would allow
CPS to pursue adoptive placements for the children, which would allow them to
have the stability lacking in their current situation.

Finally, concerning the ninth factorCany
excuse for the parents= acts or omissionsCFather
admitted drinking alcohol prior to several of the domestic violence
episodes.  Father said that he knows that
it is wrong to hit Mother and that assaults do not create a safe
environment.  He felt that he was a
better man after completing his parenting classes and counseling.

In sum, the record demonstrates that CPS and the
police had extensive involvement with this family.  Father=s long
history of engaging in domestic violence, difficulty maintaining safe and
stable housing, inconsistent employment history with no guaranteed income, and
inappropriate choices that put his children in danger, such as allowing his
mother to live with them despite her unstable mental health and volatile
relationship with Mother, all demonstrate that it was in the children=s best
interest that Father=s parental rights be
terminated.  See Tex. Fam. Code
Ann. ' 161.001(2).








Giving due consideration to evidence that the
factfinder could have reasonably found to be clear and convincing, and based on
our review of the entire record, we hold that a reasonable trier of fact could
have formed a firm belief or conviction that the termination of Father=s
parental rights would be in the children=s best
interest.  See In re M.B., No.
02-07-00280-CV, 2008 WL 2930530, at *14 (Tex. App.CFort
Worth July 31, 2008, no pet.) (mem. op.) (holding that evidence was factually
sufficient to support jury=s
finding that termination of appellant=s
parental rights was in children=s best
interest because TDFPS had received eight to ten referrals about appellant;
appellant had difficulty maintaining safe and stable housing; appellant had an
inconsistent employment history with no guaranteed income; and appellant made
inappropriate choices by living with a sex offender and engaging in domestic
violence); see also In re S.M.L., 171 S.W.3d 472, 480 (Tex. App.CHouston
[14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed
that termination of father=s
parental rights was in child=s best
interest where, among other factors, father was incarcerated at time of
termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
best-interest finding.  We overrule
Father=s first
issue.








                                          IV.  CONCLUSION

Having sustained a portion of Mother=s first
issue and a portion of Father=s second
issue, we remand this case to the trial court so that notice may be sent in
compliance with the ICWA, as outlined above. 
If, after notice and a hearing, the trial court determines that R.R. and
V.R. are not Indian children, then the termination judgment of the trial court
is affirmed.  If, after notice and a
hearing, the trial court determines that R.R. and V.R. are Indian children,
then the termination judgment of the trial court is reversed, and the trial court
shall conduct a new trial applying the ICWA.  See, e.g., Junious M., 144 Cal.
App.3d at 788, 193 Cal. Rptr. at 40; R.E.K.F., 698 N.W.2d at 150 (citing
numerous cases utilizing this procedure); I.E.M., 233 Mich. App. at 450,
592 N.W.2d at 758; C.H., 510 N.W.2d at 124.  Having overruled the balance of Mother=s first
issue, the balance of Father=s second
issue, and Father=s first issue, we grant only the
relief outlined above.

 

SUE WALKER

JUSTICE

 

PANEL: GARDNER, WALKER,
and MCCOY, JJ.

 

DELIVERED:  March 19, 2009

 











[1]The Nelson court
noted that ACongress considered and
rejected proposed language which would have restricted the application of the
ICWA protections to only enrolled members of an Indian tribe.@  Id., 888 P.2d at 126 n.4 (citing 1978
U.S.C.C.A.N. 7530, 7538B39, 7558B63).





[2]See Bureau of Indian Affairs
Guidelines for State Courts; Indian Child Custody Proceedings, available at
http://www.nicwa.org/policy/regulations /icwa/ICWA_guidelines.pdf (last
visited March 18, 2009).





[3]We would have liked to
attach a copy of this form as Appendix A to our opinion, but to do so would
have revealed R.R.=s, V.R.=s, and Mother=s full names.





[4]We have thoroughly
reviewed the reporter=s record from the
trial.  In addition, we performed a word
search on the ASCII disc filed by the court reporter as well as a word search
in the hard copy of the word index provided by the court reporter.  Nowhere in the record during trial does
Mother testify that she is not a member of the Kiowa Nation or that R.R. and
V.R. are not members.  Her testimony on
this issue at trial is minimal; she testifies that she is looking into getting
Indian Welfare benefits for the children but is having difficulty obtaining
information about her mother, who was a registered member of the Kiowa Nation,
because her mother died when she was two years old.





[5]Mother=s drug tests were
negative during July 2006.





[6]Maxey testified that
while she had the case, Father did go to jail and that a case for family-based
safety services was opened.





[7]Maxey testified that
there was no allegation that Father had ever spanked R.R.





[8]The record is unclear
regarding this date.  Initially, the
attorney for TDFPS questioned Officer Byers about November 12, 2007, but
referred to it as Athe day after you were
out there in November.@  However, several questions later, the
attorney for TDFPS questioned Officer Byers whether the environment observed in
AMay of >07@ was different from the
one he had observed in ANovember of >06.@  Therefore, we use the May 2007 date because
it appears more appropriate in the context.





[9]The record revealed that
Father completed counseling in January 2008 and that the termination trial took
place during February.





[10]Father worked as a
plumber.





[11]Father=s testimony regarding his
employment was contradictory.  In
addition to the statement above, he testified that he had been continuously
employed for the last year and that sometimes he could not make his visits
because of work; however, he also said that he is working with a friend because
he has a hard time getting a job due to his criminal background.