743 A.2d 341 (2000)
327 N.J. Super. 304
In the Matter of the GUARDIANSHIP OF J.O.; S.O.; S.O.; K.O.; K.O.; S.O. and S.O.
Superior Court of New Jersey, Appellate Division.
Submitted December 2, 1998.
Argued December 8, 1999.
Decided January 14, 2000.
*342 Diane S. Margolin, Hackettstown, for appellant (Margolin & Neuner, attorneys; Ms. Margolin, on the brief)
Lynn B. Norcia, Deputy Attorney General, for respondent Division of Youth and Family Services (John J. Farmer, Jr., Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel and on the brief; Ms. Norcia, on the brief).
The briefs of respondents J.O., S.O., S.O., K.O., K.O., S.O. and S.O. were suppressed.
Before Judges BAIME, BROCHIN and EICHEN.
The opinion of the court was delivered by
BAIME, P.J.A.D.
This appeal is from a judgment terminating appellant's parental rights to his seven youngest children. Appellant contends that the termination proceedings failed to comport with the requirements of the Indian Child Welfare Act (25 U.S.C. §§ 1901-1963). The Act requires that notice be given to the Indian child's tribe and the Secretary of the Interior[1] whenever a state court knows or has reason to know an Indian child is involved in custody proceedings. *343 Appellant contends that the Family Part was bound to implement the notice provision after his wife's attorney made reference to the possibility of Indian ancestry during a status conference. Although the parties were afforded ample opportunity to pursue this claim, it was later disavowed. We hold that the information before the Family Part was insufficient to trigger the Act's notice requirement.

I.
We need not recount the facts at length. It is enough to note that this is not a case falling within "the great middle-range" of termination proceedings involving beleaguered parents with uneven track records. New Jersey Div. of Youth and Family Services v. A.W., 103 N.J. 591, 602, 512 A.2d 438 (1986). Rather, this is one of those "extremely brutal situations" where the record starkly reveals "there is almost no humanity left in the relationship of the parent to the child." Ibid. (quoting Fanshel, Urging Restraint in Terminating the Rights of Parents of Children in Foster Care, 12 N.Y.U. Rev. L. & Soc. Change 501, 502 (1983-84)).
On June 11, 1997, appellant was convicted in Pennsylvania of 239 counts of rape, involuntary deviate sexual intercourse, aggravated indecent assault, indecent assault, corruption of minors, incest, endangering the welfare of a child and criminal conspiracy. We have no occasion to describe the lurid details surrounding these crimes. Suffice it to say, evidence was presented at appellant's trial indicating that he and his friends committed repeated, horrendous acts of sexual abuse on his children over a prolonged period of time. Appellant received a minimum sentence of 128 years. The sentence is to run consecutively to a term of imprisonment between twenty and forty years which was imposed on unrelated convictions for rape and sexual assault. Predictably, appellant's criminal conduct has had a devastating effect upon the children.
Against this backdrop, the Division of Youth and Family Services (DYFS), in its efforts to "move expeditiously to save the child[ren]," New Jersey Div. of Youth and Family Services v. A.W., 103 N.J. at 602, 512 A.2d 438, filed a motion for summary judgment. In his opposing documentary submissions, assigned counsel included a statement prepared by appellant in which he denied having sexually assaulted his children. The Family Part nonetheless concluded that the best interests of the children required dissolution of the parent-child relationship.
Appellant filed an appeal and submitted a pro se brief in which he asserted that (1) the Family Part erred in its factual findings and conclusions and (2) the termination proceedings violated federal statutes governing the rights of Indian children. We apprised appellant of his right to counsel. Following a hearing, appellant requested that an attorney be assigned to prepare a supplemental brief. The supplemental brief deals exclusively with the applicability of the Indian Child Welfare Act. We are uncertain whether appellant has abandoned his claim that he is innocent of sexually abusing his children. We thus treat this argument first and then address questions concerning the applicability of the federal legislation.

II.
We first hold that appellant's convictions for repeatedly raping his children collaterally estop him from now claiming his innocence. See In re Musto, 152 N.J. 165, 172, 704 A.2d 6 (1997); In re Coruzzi, 95 N.J. 557, 567, 472 A.2d 546 (1984). Although DYFS, which is now seeking to invoke the doctrine of preclusion, was not a party in the Pennsylvania criminal proceedings, "the question to be decided is whether [appellant] ... had his day in court on [the] issue," not whether the litigants were identical. State v. Gonzalez, 75 N.J. 181, 189, 380 A.2d 1128 (1977) (quoting McAndrew v. Mularchuk, 38 N.J. 156, *344 161, 183 A.2d 74 (1962)). So posited, appellant was afforded a full and fair opportunity to litigate the issue of his guilt in his Pennsylvania criminal trial. Facing the possibility of a cumulative sentence greater than his life span, appellant had every reason to make as vigorous and effective a defense as possible. The factual questions that were decided in the criminal case were identical to those in the termination proceedings. We conclude that appellant was barred from relitigating issues which were necessarily decided in the criminal case. Compare New Jersey Manufacturers Ins. Co. v. Brower, 161 N.J.Super. 293, 298, 391 A.2d 923 (App.Div.1978), with Eaton v. Eaton, 119 N.J. 628, 643, 575 A.2d 858 (1990); Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 397, 267 A.2d 7 (1970); Prudential Property & Cas. Ins. Co. v. Kollar, 243 N.J.Super. 150, 153-54, 578 A.2d 1238 (App.Div.1990).
The result would be the same even were we to put aside the doctrine of collateral estoppel. Appellant's conclusory denial of his guilt was not sufficient to withstand DYFS's motion for summary judgment. The evidence was so "one-sided" that DYFS was entitled to judgment as a matter of law. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 533, 666 A.2d 146 (1995). The evidence established beyond a reasonable doubt that (1) the children have been substantially harmed by parental behavior, (2) appellant is unable and unwilling to eliminate the injury caused by his offensive conduct, (3) both DYFS and the Family Part considered, but correctly rejected, alternatives to termination, and (4) the severance of parental rights will not do more harm than good. New Jersey Div. of Youth and Family Services v. A.W., 103 N.J. at 599, 512 A.2d 438; see also N.J.S.A. 30:4C-15.1.
We add that appellant's incarceration, standing alone, warranted dissolution of the parent-child relationship. In re Adoption of Children by L.A.S., 134 N.J. 127, 143, 631 A.2d 928 (1993). The concerns that give rise to the assessment of an imprisoned parent's criminality in relation to the harmful effects of a parental relationship on the children are clearly present in this case. Id. at 142, 631 A.2d 928; see also New Jersey Div. of Youth and Family Services v. V.K., 236 N.J.Super. 243, 261, 565 A.2d 706 (App.Div.1989), certif. denied, 121 N.J. 614, 583 A.2d 315 (1990). Our Supreme Court has said in this context, "[c]learly crimes of abuse against one's own children that result in substantial injury ordinarily warrant termination of parental rights." In re Adoption of Children by L.A.S., 134 N.J. at 141, 631 A.2d 928. Whether viewed in terms of abandonment or unfitness, id. at 134, 631 A.2d 928, appellant's incarceration required severance of appellant's parental rights to his children.

III.
We next consider appellant's argument that the Family Part failed to comply with its statutory duty to give notice of the pendency of the proceedings to the Bureau of Indian Affairs (Bureau). We briefly summarize the facts essential to this claim.
This case has a tortuous history. On January 15, 1993, DYFS received a referral from the Pennsylvania Office of Children and Youth Services, advising it that the O. family had a long history of sexual abuse. Appellant had been convicted of several sexual crimes, but was free on bail. Charges of incest and other offenses against his children were pending. After the children had been removed from the care of appellant and his wife, the family had moved to New Jersey. Pennsylvania authorities then returned the children to Mrs. O. after she obtained a domestic violence order which forbade appellant from having any contact with the family.
On January 25, 1993, DYFS obtained an order from the Family Part again removing the O. children and placing them in foster care. DYFS's application and the resulting order were based on information *345 that the Pennsylvania courts had vacated the domestic violence order and that appellant was having contact with the children. On April 26, 1993, New Jersey authorities brought criminal charges against the O.'s. Mrs. O. was later convicted of five counts of endangering the welfare of a child. Although appellant was charged with a variety of sexual offenses involving his children, the indictment was placed on the inactive list after appellant was convicted of similar crimes in Pennsylvania and was sentenced to 168 years imprisonment with a 120 year minimum term.
On June 26, 1995, DYFS commenced termination of parental rights proceedings against both O.'s. During a status conference on June 26, 1996, counsel for Mrs. O. raised the possibility that the children might be of Indian heritage. Mrs. O.'s counsel assured the court that his client would further research her genealogy. A telephone status conference was conducted on October 4, 1996. During the course of that conference, counsel for Mrs. O. represented that he had made repeated requests to his client for information concerning the children's heritage but she had failed to provide him with any information. Appellant's attorney and the law guardians representing the interests of the children were silent on the issue. The Family Part entered an order on October 28, 1996, providing "if no proof is given... that this [c]ourt lacks jurisdiction," the issue is to be deemed waived and "the defendants shall be hereafter precluded from raising [the question]." The issue remained dormant until the next telephone status conference which was conducted in late November 1996. Based upon counsel's failure to present any information regarding the children's heritage, the Family Part entered an order on November 27, 1996, barring the parties from raising questions concerning the court's jurisdiction.
Following entry of this order, no further mention was made of the children's alleged Native American heritage. Neither counsel for appellant nor counsel for Mrs. O. ever raised the issue. Moreover, five different attorneys represented the O. children. None of these attorneys ever suggested that the children had Native American ancestry. Further, Mrs. O. elected to testify in June 1998. She made no mention of her children having Indian heritage. Nor did she suggest that either she or any family relative was a member of an Indian tribe or was eligible for tribal membership. Mrs. O. subsequently surrendered her parental rights. Only appellant has filed an appeal.
It is against this factual backdrop that we consider appellant's argument that the judgment must be reversed because the proceedings before the Family Part did not conform to the requirements of the Indian Child Welfare Act.
Congress's articulated objective in adopting the Act was to preserve the existence and integrity of Indian tribes by preventing the unwarranted removal of Indian children from their families by nontribal public and private agencies. See H.R.Rep. No. 95-1386, at 9 (1978), reprinted in 1978 U.S.C.C.A.N. 7530, 7531; see also Barsh, The Indian Child Welfare Act of 1978: A Critical Analysis, 31 Hastings L.Rev. 1287, 1299 (1980). To accomplish this mission, the Act confers on tribal courts exclusive jurisdiction over any child custody proceedings involving an Indian child who resides or is domiciled on the tribe's reservation, 25 U.S.C. § 1911(a), and in other cases provides for the permissive transfer of state child custody proceedings to a "tribal court" in the absence of "good cause to the contrary," 25 U.S.C. § 1911(b). The Act also grants the child's tribe the right to intervene in any custody proceeding that is not removed to a tribal court. 25 U.S.C. § 1911(c).
In state court proceedings involving involuntary placement of Indian children, the Act provides for family counseling and court-appointed counsel to ensure that the parties are aware of their legal rights. 25 U.S.C. § 1912(b)-(d). The Act *346 also establishes substantive standards "exceeding those provided for non-Indian parents under state law." In re Adoption of a Child of Indian Heritage, 111 N.J. 155, 168, 543 A.2d 925 (1988); see also In re Adoption of a Child of Indian Heritage, 219 N.J.Super. 28, 32, 529 A.2d 1009 (App. Div.1987), aff'd, 111 N.J. 155, 543 A.2d 925. Proof beyond a reasonable doubt "that the continued custody ... is likely to result in serious emotional or physical damage to the child" is required to terminate parental rights. 25 U.S.C. § 1912(f). Such proof requires the presentation of testimony by a qualified expert witness that remedial help will not be fruitful and that termination is necessary to protect the health and safety of the child. Ibid. To secure these protections, the child involved must be deemed an "Indian." In re Adoption of a Child of Indian Heritage, 111 N.J. at 171, 543 A.2d 925. "Indian Child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).
Critical to the issues raised here, the Act calls for notice to be given to the child's parents or custodian, the child's tribe or in some circumstances the Bureau. 25 U.S.C. § 1912(a). The notice obligation is triggered when the court "knows or has reason to know that an Indian Child is involved" in custody proceedings. Ibid. The Bureau has published guidelines to assist state courts in determining whether notice is required. These guidelines provide that a court has reason to know that an Indian child is involved where:
(i) Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
(ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.
(iii) The child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.
(iv) The residence or domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.
(v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child.

[Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67586 (1979).]
These guidelines are not binding upon state courts. In re Adoption of a Child of Indian Heritage, 219 N.J.Super. at 41, 529 A.2d 1009 (citing In re Junious M., 144 Cal.App.3d 786, 193 Cal.Rptr. 40 (1983)).
In In re Adoption of a Child of Indian Heritage, 111 N.J. 155, 543 A.2d 925, our Supreme Court expressed doubt "as to whether the ... guidelines accurately reflect Congress's intent" respecting the circumstances that trigger the Act's notice requirement. Id. at 187-88 n. 12, 543 A.2d 925. In declining to follow guideline (v), the Court held that mere knowledge of an attorney that an Indian child is involved in custody proceedings does not constitute constructive notice sufficient to require the Family Part to notify the Bureau. Ibid. Because there was no suggestion that either the judge or the investigating agency had knowledge of the child's Indian ancestry, the Court refused to reopen a final judgment of adoption. Id. at 187, 543 A.2d 925; see also In re Adoption of a Child of Indian Heritage, 219 N.J.Super. at 41-42, 529 A.2d 1009.
The decisions of other jurisdictions tend to be fact sensitive and offer little guidance. Most courts have held that the Indian status of a child need not be certain or conclusive in order to trigger notice. See, e.g., In re Pedro N., 35 Cal.App.4th 183, 41 Cal.Rptr.2d 819, 821 (1995) ("The Indian status of the child need not be certain."); In re Kahlen W., 233 Cal. *347 App.3d 1414, 285 Cal.Rptr. 507, 511 (1991) (The child's status as an Indian need not be conclusive.); In re Junious M., 144 Cal.App.3d 786, 193 Cal.Rptr. at 43 (whether minor is in fact an Indian child is an issue for the tribe or, alternatively, the Bureau); In re I.E.M., 233 Mich.App. 438, 592 N.W.2d 751, 756 (1999) (father's statement to psychologist included in report given to court provided sufficient notice); In re M.C.P., 153 Vt. 275, 283, 288, 571 A.2d 627, (1989) (tribe is the "arbiter of its membership"). These holdings rest upon the goals sought to be achieved by the notice requirement. The requisite notice to the tribe or the Bureau serves a two-fold purpose. It enables the tribe to investigate and determine whether the minor is an Indian child, and it advises them of the tribe's right to exercise jurisdiction or intervene in the state proceedings. In re Pedro N., 41 Cal.Rptr.2d at 821, 35 Cal.App. 4th 183. It has thus been said that "it is preferable to err on the side of giving notice," In re I.E.M., 592 N.W.2d at 757, because "[i]t is impossible for a tribe to determine whether a child is a tribal member or eligible for membership if it never receives [notification] of the proceedings." In re J.T., 166 Vt. 173, 693 A.2d 283, 289 (1997). We agree with this view.
We nevertheless find nothing unreasonable in the course adopted by the Family Part judge in this case. The amorphous statement of Mrs. O.'s attorney did not in itself trigger the Act's notice requirement. The Family Part judge was not unreasonable in requiring the parties to file some formal motion raising the alleged Indian status of the children and contesting the court's jurisdiction. We stress that the Family Part judge did not require a conclusive showing that the children qualified as Indians under the Act. He merely required that a motion be filed in the event any of the parties wished to pursue that claim. The judge never suggested that the Indian ancestry of the children had to be proven conclusively in order to trigger the notice requirement. Presumably, an affidavit would have sufficed to require the court to notify the Bureau.
We add that the Family Part was without adequate information to effectively notify the Bureau of Mrs. O.'s claim. The pertinent regulations require the notice to contain (1) the name of the Indian child, the child's birthdate and birthplace, (2) the name of the Indian tribe in which the child is enrolled or may be eligible for enrollment, and (3) the names of the Indian child's biological mother and father, maternal and paternal grandparents and great-grandparents or Indian custodians, including maiden, married and former names or aliases, their birthdates, places of birth and death, and tribal affiliation numbers. 25 C.F.R. § 23.11(d) (1994). Neither appellant nor Mrs. O. provided even a fraction of this information so that effective notice could be made.
Succinctly stated, the Family Part judge had no legitimate reason to believe that the children had Indian ancestry. The family's background did not suggest any Indian heritage. Neither Mrs. O. nor appellant nor the children ever lived on or near a reservation. Upon being afforded ample opportunity to pursue the claim of Indian ancestry, neither the parties nor the children nor the attorneys provided the court with any information suggesting Indian ancestry. The issue was never raised again. Indeed, to this day, nothing has ever been presented to us suggesting that the children are of Indian heritage. We thus find that the Family Part had no reason to notify the Bureau of the pendency of the termination proceedings.

IV.
We hold that the vague and casual reference to Indian ancestry made by Mrs. O.'s attorney was insufficient to trigger the Act's notice requirement. We need not decide whether a violation of the Act would require a reversal of the Family Part's judgment.
*348 We cannot, however, close our eyes to reality. We would be myopic were we to ignore the compelling evidence presented below requiring dissolution of parental rights. We are obliged to add for the sake of completeness that applying the enhanced and more rigorous federal requirements, we are virtually certain that the result would have been the same.
As we noted earlier, in the absence of "good cause to the contrary," proceedings to terminate the parental rights to an Indian child may be transferred to a tribal court. 25 U.S.C. § 1911(b). Although "good cause to the contrary" is not defined in the Act, the legislative history indicates that Congress intended to vest substantial discretion and flexibility in the state courts in determining whether to retain jurisdiction. H.R.Rep. No. 95-1386, at 21 (1978), reprinted in 1978 U.S.C.C.A.N. 7530, 7543. The Bureau has published interpretive, nonbinding guidelines which suggest that the state courts consider the "advanced stage [of the proceedings] ... when the petition to transfer [is] received," forum non conveniens principles, and the child's contacts or lack of contacts with the tribe. Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. at 67591. These considerations would have militated strongly in favor of retaining jurisdiction.
It will be recalled that DYFS first removed the children from the O.'s on January 25, 1993, approximately three years before Mrs. O.'s lawyer raised the question of Indian ancestry. The children were placed in foster care under the supervision of the court and, at least to some extent, had established roots in their new living arrangements. Taking the children from a stable environment and transferring the proceedings to a tribal court would probably have had a devastating effect upon them.
Whether a child's best interests should be a factor in resolving the question of good cause not to transfer is a difficult question. See Michael J. Dale, State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test, 27 Gonz. L.Rev. 353, 387 (1991-92). The courts are split on the issue. Compare In re Maricopa County Juvenile Action No. J.S.-8287, 171 Ariz. 104, 828 P.2d 1245 (App.1991) (best interest standard is applicable in determining good cause); In re Robert T., 200 Cal.App.3d 657, 246 Cal. Rptr. 168 (1988) (trial court properly considered child's best interests in denying transfer); In re Adoption of T.R.M., 525 N.E.2d 298 (Ind.1988) (best interests of child must be considered in determining good cause), cert. denied, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989); In re C.W., 239 Neb. 817, 479 N.W.2d 105 (1992) (the Act does not change the cardinal rule that best interests of the child are paramount); In re N.L., 754 P.2d 863 (Okla.1988) (best interests of child should be considered in determining whether to transfer case to tribal court); People in Interest of J.J., 454 N.W.2d 317 (S.D.1990) (recognizing best interests of the child as a proper factor to consider), with People in Interest of J.L.P., 870 P.2d 1252 (Colo.Ct.App.1994) (best interest standard is inapplicable in determining good cause); In re Armell, 194 Ill.App.3d 31, 141 Ill.Dec. 14, 550 N.E.2d 1060 (1990) (best interests of the child is not a factor to consider), appeal denied, 132 Ill.2d 545, 144 Ill.Dec. 255, 555 N.E.2d 374 , cert. denied, 498 U.S. 940, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990); In re Guardianship of Ashley Elizabeth R., 116 N.M. 416, 863 P.2d 451 (Ct.App.1993) (best interests of the child standard is not applicable to determine jurisdiction); Yavapai-Apache Tribe v. Mejia, 906 S.W.2d 152 (Tex.App.1995) (consideration of best interests in determining good cause is an abuse of discretion). Although we have no occasion to decide the question here, we note that the best interests of the child test is the backbone of American family law and we would be very loathe to ignore that standard in the context of determining whether retention of jurisdiction in the *349 Family Part is warranted. Where, as here, the children had never lived on an Indian reservation and had no contact with a tribe or tribal member, we would perceive no sound reason to transfer the proceedings to a tribal court.
We are also satisfied that other requirements of the federal Act were met. A court is required to consider testimony of a qualified expert witness before termination of parental rights of the parent or Indian custodian. 25 U.S.C. § 1912(f). However, "[s]pecial knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias." In re N.L., 754 P.2d at 867. "[W]hen cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life." Ibid.; see also In re Maricopa County Juvenile Action No. J.S.-8287, 828 P.2d at 1252; In re Kreft, 148 Mich.App. 682, 384 N.W.2d 843, 847 (1986); In re C.W., 479 N.W.2d at 112; In re N.L., 754 P.2d at 867. Here, the expert report submitted to the Family Part primarily concerned the unfitness of Mrs.O. It nevertheless provided compelling evidence that appellant was also unfit and that his conduct substantially threatened the health and safety of the children.
The Act requires that a party seeking to terminate parental rights must show that "active efforts have been made to provide remedial services ... and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). However, we are aware of no program, nor does appellant suggest any, that would remedy the devastating effect of the sexual abuse committed. See People in Interest of J.J., 454 N.W.2d at 325 (no remedial program could prevent recurrence of sexual aggression toward children); In re Dougherty, 236 Mich.App. 240, 599 N.W.2d 772, 775 (1999) (active efforts to reunite children with their parent were not necessary when father was incarcerated for sexually abusing his children).
Finally, although the Family Part applied the clear and convincing evidence standard, appellant's unfitness is so plain that the result would not change were we to apply the beyond a reasonable doubt standard. However phrased and whatever standard is applied, the record provides ample support for severing appellant's parental rights.
Affirmed.
NOTES
[1] The Secretary of the Interior uniformly refers such notices to the Bureau of Indian Affairs (Bureau) for its investigation. Therefore, we will refer to the Bureau as the recipient of notice throughout the remainder of the opinion.