**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4390-15T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

J.N.,

 Defendant-Appellant,

and

S.L.,

 Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP OF
K.N., K.L. and S.N.,

 Minors.

_____

   Submitted February 1, 2017 — Decided  April 6, 2017

   Before  Judges  Fuentes,  Carroll  and  Gooden
   Brown.

   On  appeal  from  the  Superior  Court  of  New
   Jersey,  Chancery  Division,  Family  Part,
   Middlesex County, Docket No. FG-12-93-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Carol A. Weil, Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Michael A. Thompson, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor S.N. (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

Defendant J.N.[1] appeals from the June 6, 2016 judgment of guardianship which terminated his parental rights to his son, S.N., born in 2004. The judgment also terminated defendant's parental rights to a daughter, K.L., born in 2000, by virtue of defendant's voluntary identified surrender, and approved a permanency plan of kinship legal guardianship (KLG) for another daughter, K.N., born in 2002. Defendant only appeals the termination of his parental rights to S.N. All three children have the same biological mother, S.L. S.L.'s parental rights to S.N. and K.L. were also terminated. S.L. does not appeal the termination.

---

[1] Pursuant to Rule 1:38-3(d), we use initials to protect the confidentiality of the participants in these proceedings.

Defendant argues that the trial court erred in finding that the Division met its burden of proof with respect to prongs three and four of the best interests test embodied in N.J.S.A. 30:4C-15.1(a)(3) and (4). Specifically, defendant argues that the Division failed to properly assess his mother for KLG and the court failed to consider alternatives to termination of parental rights. Defendant also argues for the first time on appeal that the court failed to confirm the Division's compliance with the provisions of the Indian Child Welfare Act (ICWA), 25 U.S.C.A. §§ 1901-63 (1982). In response, the Division of Child Protection and Permanency (Division) and the Law Guardian argue that defendant's mother was assessed and properly ruled out, and expert testimony supported the Division's plan for select home adoption. Further, they assert that there was insufficient evidence of defendant's membership in an Indian tribe to trigger ICWA. We agree and affirm substantially for the reasons stated by Judge Lorraine Pullen in her comprehensive oral opinion issued on May 26, 2016.

The guardianship trial lasted three days from February 23 to 25, 2016. Three Division workers and an expert qualified in psychology testified for the Division. In addition, numerous documentary exhibits were admitted into evidence. Defendant's mother testified on his behalf. The trial evidence is set forth at length in the judge's opinion and will not be repeated here in

the same level of detail. Defendant fathered eight children, seven of whom were in his care.[2] From 2008 to 2012, the Division received multiple referrals alleging inadequate supervision, and environmental and educational neglect, all of which were determined to be unfounded.

On February 20, 2013, the Division received another referral alleging that defendant drank to the point of intoxication daily, became violent when intoxicated and had altercations in his home necessitating a police response. In addition, it was alleged that the home was filthy and the children were unkempt and left unsupervised. On March 5, 2013, while the Division's investigation was ongoing, the Division received another referral that one of defendant's daughters, Ka.N., was transported by ambulance to the hospital, complaining of pain, accompanied by defendant who appeared to be intoxicated. When defendant was interviewed at the hospital by Division caseworkers, he admitted drinking that day but denied being intoxicated. The Division caseworkers who responded to defendant's home found the children being supervised

---

[2] The four other children in defendant's care had three different biological mothers. T.M. is the biological mother of Ky.N., a girl born in 1996; Su.N. is the biological mother of Ka.N., a girl born in 2001; and A.C. is the biological mother of T.N., a boy born in 2006, and Si.N., a boy born in 2007. Defendant's eighth and eldest child, Kl.N., a girl born in 1991, had reached the age of majority throughout most of these proceedings.

by defendant's sixteen-year-old daughter, Ky.N., and defendant's adult paternal cousin, both of whom denied seeing defendant drinking that day.

The Division executed an emergency removal of all seven children and was granted custody of the children by the trial court on March 7, 2013. Initially, the children were placed with defendant's mother, V.N.[3] After further investigation, the Division substantiated defendant for inadequate supervision based on the March 5, 2013 incident, and educational neglect based on reports of the children's poor school attendance and chronic lateness. On April 10, 2014, following a fact-finding hearing, the court determined that defendant abused or neglected his children, but concluded that the Division met its burden of proof only with respect to the allegations of educational neglect, N.J.S.A. 9:6-8.21(c).

Following the removal of the children, over the course of approximately two years, evaluations and services were provided to defendant by the Division to facilitate reunification, and compliance reviews were conducted to monitor and assess defendant's compliance. A July 1, 2013 psychological evaluation

---

[3] The four children who were not the subjects of the guardianship complaint were ultimately placed with their respective biological mothers.

diagnosed defendant with alcohol dependency, impulse control disorder, intermittent explosive disorder, and narcissistic personality disorder with obsessive compulsive traits. The psychologist recommended successful completion of a substance abuse treatment program followed by aftercare, frequent and random drug testing, individual psychotherapy, anger management counseling, employment, and a home assessment.

Defendant was afforded substance abuse treatment, anger management counseling, family counseling, parenting skills education, supervised and unsupervised visitation, linkage to community and employment resources, and transportation services. Although there was sporadic compliance, defendant was unable to maintain sobriety, stable housing or employment. Defendant was inconsistent with his attendance at various substance abuse treatment programs, failed to comply with program requirements, and failed to abide by recommendations for a higher level of care. In addition, defendant often failed to provide urine samples, provided diluted samples, and provided samples that produced disputed results. Further, although defendant was generally consistent with his attendance at supervised visitation and family counseling, he was often late and left early. Additionally, at times, defendant was reportedly inattentive to the children during the sessions and smelled of alcohol.

After granting defendant two extensions to complete court ordered services, the court ultimately approved a plan for termination of parental rights and a complaint for guardianship of S.N. was filed on May 26, 2015. S.N. is a special needs child. After his initial placement with V.N., S.N. was moved to an approved resource home with his brothers on March 13, 2013. Thereafter, S.N. was removed from a series of unsuccessful placements, including removal from his mother, S.L., after she tested positive for drug use while S.N. was in her care.

On November 17, 2015, S.N. was hospitalized in a psychiatric unit for making suicidal and homicidal threats. He was diagnosed with attention deficit hyperactivity disorder (ADHD), impulse control disorder and disruptive mood dysregulation disorder. After S.N. was discharged on December 10, 2015, he was placed in a therapeutic group home where he will remain for six to twelve months, depending on his progress. The Division's approved permanency plan for S.N. was adoption by his half-brother, A.F., one of S.L.'s other sons, or select home adoption, for which there were three approved homes willing to adopt a child with S.N.'s special needs. S.N.'s prospects for adoption were characterized as extremely positive and promising.

The Division presented unrebutted expert testimony that despite the plethora of services provided to defendant, he was

unwilling or unable to overcome or remove the harms facing his children and was not capable of parenting at the time of the guardianship trial or in the foreseeable future. The expert explained that defendant downplayed his alcohol use, indicated that he did not need substance abuse treatment, failed to remediate his drinking problem, and deflected blame for his shortcomings onto others.

Based on the psychological and bonding evaluations conducted, the expert described defendant's bond with his children as "insecure." According to the expert, defendant lacked the predictability, reliability and consistency necessary to form a basis of trust with his children. The expert explained that defendant's interactions with his children were not nurturing but bordered on emotional abuse "in terms of belittling, and shaming, and embarrassing his children." In addition, the expert noted that defendant was skeptical and dismissive of S.N.'s severe emotional and psychological problems. She described defendant as a poor role model who brought out the worst in his children, and termination "will not do more harm than good."

According to the expert, defendant acknowledged being unable to care for his children. She noted that defendant was unemployed, homeless and recently diagnosed with prostate cancer. The expert recommended termination of defendant's parental rights with select

home adoption for S.N. or, in the alternative, adoption by a well-adjusted adult sibling able to address S.N.'s special needs. Acknowledging S.N.'s desire to remain with a family member, the expert explained that although S.N. "would have . . . a sense of conflict in part because there's no plan for him right now[,]" delaying permanency would be harmful because "it puts [him] in a state of limbo" that adversely affects his self-esteem and his self-worth and his "ability to establish healthy[] independence."

V.N. testified that S.N. resided with her from the age of three to five. According to V.N., after S.N. and his two brothers were removed on March 13, 2013, with the exception of Ky.N., the three girls remained in her care until September 2013 when there was an incident during which V.N. admitted slapping K.N. in the face with an open hand when she found her with a boy. Although abuse was not established, all three girls were removed from her care on September 10, 2013.

On July 23, 2015, the Division ruled V.N. out as a placement option on best interests grounds. The Division's decision was based primarily on concerns that she allowed defendant to have unsupervised access to the children, she did not believe that defendant had a drinking problem, she had inadequate space in her two-bedroom apartment to accommodate the children, and there were concerns about the children's school attendance and appearance

while in her care. V.N. did not appeal the Division's determination. However, in an attempt to gain custody of S.N. and K.N., she filed a FD complaint and a motion to intervene in the FG case, both of which were rejected. V.N., a judge's secretary, testified that she anticipated retiring the following month and was willing to undergo training to care for S.N. She also acknowledged defendant's drinking problem and vowed to deny him access to the children.

In her comprehensive oral opinion, the judge found the Division's evidence persuasive and credited the testimony of the Division caseworkers as well as the expert's opinions. The judge made meticulous factual findings as to all four prongs of the best interests test embodied in N.J.S.A. 30:4C-15.1(a), and thereafter concluded that the Division had satisfied all four prongs by clear and convincing evidence. See N.J.S.A. 30:4C-15.1(c).

The judge found "no doubt" that S.N. "[has] been and will continue to be placed in harm's way if returned to the custody of . . . [defendant,]" whose "extensive use of alcohol and denial of the fact that he is an alcoholic has placed the children in harm's way repeatedly." Further, the judge found that although defendant "loves" S.N. and "has the intelligence needed to understand and rectify his present situation[,]" he "is incapable of insuring the safety, health and development" of S.N. and "is unwilling to

10

eliminate the harm that lead to the children's removal from his custody."

The judge continued that despite the Division's efforts, defendant "has not seriously participated in any of the services offered by the Division" and "cannot remediate [his] parental deficits . . . ." Notably, the judge found that the KLG plan offered by defendant was "not offered with the best interest of the [child] as a priority." Instead, defendant's plan for S.N. placed defendant's "needs and wants ahead of [S.N.'s]" by affording defendant "the option of injecting [himself] into the life[] of [S.N.] . . . whenever it suits [his] needs." After considering the alternatives presented, the judge concluded that termination of defendant's parental rights to S.N. "will not do more harm than good."

The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a). It accords with N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420 (2012); N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88 (2008); In re Guardianship of K.H.O., 161 N.J. 337 (1999); In re Guardianship of D.M.H., 161 N.J. 365 (1999); and N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591 (1986), and is more than amply supported by the record. F.M., supra, 211 N.J. at 448.

We reject defendant's argument that the Division failed to properly assess his mother for KLG. A parent "may request . . . that the court consider a [KLG] arrangement as an alternative disposition[,]" but "[o]nly the [D]ivision or the court" is permitted to ultimately decide whether to seek that alternative disposition. N.J.S.A. 30:4C-87. Our Supreme Court has made clear that KLG should only be considered when adoption is not possible:

> The plain language of the [Kinship] Act, as well as its legislative history, establish [KLG] as a more permanent option than foster care when adoption "is neither feasible nor likely" and "kinship legal guardianship is in the child's best interest." N.J.S.A. 3B:12A-6d(3)-(4); [N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 88 (App. Div. 2003)]. Conversely, when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights under N.J.S.A. 30:4C-15.1(a)(3).
>
> [N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512-13 (2004).]

Here, the record amply supports the court's determination that adoption was both feasible and likely for S.N. and the undisputed expert testimony supported the Division's plan for adoption. Moreover, although V.N. was assessed and ruled out by the Division, the court noted that its finding did "not preclude the Division from investigating" V.N. for "permanent placement if warranted."

We also reject defendant's belated argument that the court failed to confirm the Division's compliance with the provisions of ICWA. In the course of eliciting information from defendant to effectuate the voluntary identified surrender of K.L., defendant responded to his attorney's question regarding membership or eligibility for membership in a federally recognized American Indian tribe by stating "[i]t was brought to my attention it was Mattaponi and Pamunkey. We just haven't got proof of it yet." When asked whether he obtained any proof since the day before, defendant responded "[n]o." Defendant confirmed that he was "comfortable with a no until [he] can find any information." Defendant's attorney stated to the court that she did not have enough information to show that ICWA applied. The court accepted the voluntary surrender but directed defense counsel to advise the court if additional information regarding membership in a recognized American Indian tribe was uncovered.

ICWA states

> it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

13

[25 U.S.C.A § 1902.]

In addition, in state court proceedings involving an Indian child, ICWA requires "the party seeking the foster care placement of, or termination of parental rights to, an Indian child [to] notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 U.S.C.A. §1912(a). "The purpose of giving notice is to give the Indian tribe the opportunity to determine whether the child is an 'Indian child' as defined by the [Act], and, if so, to intervene in the termination proceeding." N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 369 (App. Div. 2015) (citation omitted); In re Guardianship of J.O., 327 N.J. Super. 304, 315 (App. Div.) (citation omitted), certif. denied, 165 N.J. 492 (2000).

An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4). "Indian tribes have exclusive authority to determine who is a member or eligible for membership in a tribe." K.T.D., supra, 439 N.J. Super. at 369 (citation omitted). If a child is an

"Indian," the termination of his or her parents' rights cannot be ordered without "a determination, supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. § 1912(f). The Division must also establish that it provided remedial services but that those services were not successful. 25 U.S.C.A. § 1912(d).

Other than defendant's vague and inconclusive references to "Mattaponi" and "Pamunkey," there was no reason to believe that S.N. was of Native American heritage. Cf. K.T.D., supra, 439 N.J. Super. at 372. Where, as here, there are merely "vague and casual reference[s] to Indian ancestry[,]" such references are insufficient to trigger the notice requirements of ICWA. J.O., supra, 327 N.J. Super. at 317. However, even if S.N. was an "Indian" child, the court's termination of defendant's parental rights was consistent with ICWA. Although the court evaluated the termination of defendant's parental rights under the clear and convincing evidence standard in accordance with New Jersey law, we are satisfied that the result would have been the same under the enhanced and more rigorous federal requirements. Id. at 320.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15                                    A-4390-15T1