# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1683-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

V.C.,

     Defendant-Appellant,

and

J.B.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.D.B.,
a minor.

_____

Submitted October 1, 2024 – Decided October 25, 2024

Before Judges Gooden Brown and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0012-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Christine Olexa Saginor, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant V.C.[1] appeals from the January 17, 2024, judgment of guardianship entered following a trial, terminating her parental rights to her son, C.D.B., born October 28, 2021. C.D.B. has been placed in the resource care of his maternal grandmother (MGM) since his removal when he was born exposed to marijuana. MGM is committed to adoption. J.B., C.D.B.'s biological father, voluntarily surrendered his parental rights to MGM on July 24, 2023, and is not participating in this appeal.

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

On appeal, V.C. argues the trial judge erred in concluding that the Division of Child Protection and Permanency (Division) met its burden of proving all four prongs of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a). The Law Guardian supported termination during the trial and, on appeal, joins the Division in urging us to reject defendant's arguments and affirm. Having considered defendant's arguments in light of the record and applicable legal principles, subject to the limited remand discussed below, we affirm the judgment terminating parental rights substantially for the reasons expressed in the judge's comprehensive and well-reasoned oral opinion.

By way of background, N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

A-1683-23

(4) Termination of parental rights will not do more harm than good.

The Division "bears the burden of proving each of those prongs by clear and convincing evidence." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606 (2007). The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 166 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506 (2004)). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999) (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

On December 7, 2022, the Division filed a verified complaint to terminate defendant's parental rights and obtain guardianship of C.D.B., followed by relative adoption. The complaint stemmed from allegations of V.C.'s parental unfitness revolving around her chronic mental illness, substance abuse, and housing instability. The Division first became involved after receiving a referral

4

from the social worker at the hospital where C.D.B. was born, reporting multiple concerns regarding defendant's ability to safely parent the newborn.

During the ensuing three-day guardianship trial, the Division presented detailed records and testimony from family service specialist Diane McPeek and caseworker Ashley Markferding, chronicling the Division's continuous involvement with and persistent efforts to provide defendant services, including weekly therapeutic and supervised visitation, parenting skills development, psychological and psychiatric assessments, individual psychotherapy, psychiatric treatment, medication monitoring, substance abuse evaluations and treatment, drug screens, and transportation. The Division workers reported defendant's inconsistent participation in services and marginal compliance.

Amanda Catizone, defendant's therapeutic visitation clinician, testified and confirmed that although their services were specifically tailored to address defendant's mental health and psychiatric issues, defendant showed no improvement. Markferding also testified that the Division had no concerns with MGM's ability to adopt and raise C.D.B. and explained that MGM had repeatedly expressed a preference for adoption rather than Kinship Legal Guardianship (KLG) after both options were explained to her in detail.

A-1683-23

Barry Katz, Ph.D., who was qualified as an expert in forensic psychology, parental fitness, attachment, and bonding, evaluated defendant, conducted bonding evaluations, and testified for the Division. He recounted defendant's diagnosis of bipolar disorder, schizoaffective disorder with psychotic features, and severe cannabis use disorder. Katz detailed defendant's twenty-year history of mental illness and non-compliance with medications, leading to numerous psychiatric hospitalizations. He reported that among other things, defendant's mental illness caused fantasy-based and delusional ideation, resulting in her making baseless accusations such as accusing MGM of sexually molesting C.D.B. and accusing various Division workers and treatment providers of having a sexual relationship with J.B. Katz also noted that defendant's report of self-medicating with marijuana for her anxiety would only serve to increase her already impaired judgment.

According to Katz, defendant made little progress stabilizing her mental health, showed signs of decompensating, was not self-sufficient, and demonstrated an "ongoing inability . . . to meet her own needs, let alone take on the needs of a . . . child." In his opinion, defendant was not able to care for C.D.B. now or in the foreseeable future and termination of parental rights would not cause harm to C.D.B. In support, Katz related that C.D.B. had "formed a

6

bond and attachment to [MGM]," who had cared for him since birth, but did not demonstrate a bond with defendant.

Defendant testified on her own behalf. She acknowledged her mental illness but stated "it's totally under control." She expressed concerns about MGM caring for C.D.B. given MGM's age and reiterated allegations of C.D.B. being abused in MGM's care. Nonetheless, defendant acknowledged that she did "not have a place to live where [she] could care for a child."

In an oral opinion rendered from the bench on January 2, 2024, the judge determined the Division "establishe[d] by clear and convincing evidence each of the four prongs" of the best interests standard. As to prong one, the judge found that

> [defendant's] complete absence of care and nurture for the entirety of C.D.B.'s life coupled with the risks associated with her current mental health presentation lead this [c]ourt to find by clear and convincing evidence that C.D.B.'s safety, health and development has been and will continue to be endangered by the parental relationship with [defendant].

In evaluating prong two, the judge considered the unrebutted "factual evidence" and credited Katz's "uncontroverted and unrefuted" testimony of defendant's "case history" and "current presentation." The judge concluded:

> Given . . . Katz'[s] findings that [defendant] is unable to successfully meet her own daily activities of living[,]

the [c]ourt finds she would, of course, therefore, be unable to provide a stable home for C.D.B. This record reflects several instances of [defendant] being homeless and as to whether delay will add to that harm[,] the [c]ourt finds that further delay will add to the harm.

C.D.B. is legally entitled to permanency, a permanency that has alluded him since his birth two years [and] two months ago when he was placed with his maternal grandmother directly from the hospital.

. . . Katz testified that "continued contact with . . . his mother . . . would be detrimental[.]" . . . [D]efendant[] has sadly been unable to make any progress in . . . remediating her mental health issues as well as her substance misuse issues.

Turning to prong three, the judge detailed the Division's extensive efforts to provide evaluations and services to address defendant's parenting deficits as well as her "mental health and substance misuse issues," but acknowledged "defendant's progress [was] hindered by her unwillingness or inability to recognize her mental health deficits." Crediting the "unrebutted testimony" of Markferding and McPeek, "together with the documentary proofs," the judge found "by clear and convincing evidence" that the Division provided "reasonabl[e] and specifically tailored services" to "help [to] correct the circumstances that led to C.D.B.'s placement," explaining:

[T]he Division first secured the necessary diagnostic evaluations and then made referrals to individual

therapy, substance misuse therapy, . . . and therapeutic visitation.

> The . . . record also confirms the Division also provided updates to [defendant] regarding her son . . . and additional visits with C.D.B. supervised by the maternal grandmother. That is, until the maternal grandmother was no longer willing to supervise visits due to [defendant's] allegation of her sexually abusing [C.D.B.]

> [Defendant's] staunch resistance to engaging in the referenced services due to her position that there was no need is not held against the Division.

As to the judge's consideration of alternatives to termination, the judge observed:

> [KLG] was discussed with the maternal grandmother as a means to avoid termination of parental rights. However, this was rejected by [MGM] as she consistently preferred adoption.

> The [c]ourt cannot find fault with [MGM's] decision in this regard given [defendant's] mental instability . . . which led to [defendant] making unsubstantiated and baseless accusations of [MGM] sexually assaulting C.D.B. . . . .

> To ensure that [MGM] . . . understood all the ramifications of [KLG] versus adoption[,] the record establishes the Division visited with [MGM] to discuss same on two separate occasions.

Thus, according to the judge, "each of the prong three requirements have been satisfied by clear and convincing evidence."

9

Finally, as to prong four, the judge was persuaded by Katz's testimony that C.D.B. "[did] not demonstrate having a bond with [defendant]," but was "flourishing in the care of [MGM] . . . to whom he is significantly bonded" and who "is committed to adopting and caring for C.D.B. throughout his minority." The judge concluded:

> The proofs established by clear and convincing evidence that not only will termination of parental rights not do more harm than good but given [defendant's] deficits[,] the natural father's surrender[,] and the loving care C.D.B. has received from [MGM,] termination of parental rights is in C.D.B.'s best interest and it will not do more harm than good.

The judge entered a memorializing order, and this appeal followed.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN CONCLUDING THAT [C.D.B.'s] SAFETY, HEALTH, OR DEVELOPMENT HAS BEEN OR WILL CONTINUE TO BE ENDANGERED BY HIS RELATIONSHIP WITH [DEFENDANT].

POINT II

THE TRIAL COURT ERRED IN CONCLUDING THAT [DEFENDANT] IS UNWILLING OR UNABLE TO REMEDIATE HER PERCEIVED PARENT ISSUES.

POINT III

A-1683-23

THE [JUDGMENT] OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED IN CONCLUDING THAT [THE DIVISION] MADE REASONABLE EFFORTS TO PROVIDE THIS FAMILY WITH SERVICES AND BECAUSE ALTERNATIVES TO TERMINATION OF [DEFENDANT'S] PARENTAL RIGHTS WERE NOT PROPERLY CONSIDERED.

POINT IV

THE [JUDGMENT] OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE THE TRIAL COURT GAVE UNDUE WEIGHT TO THE INCOMPLETE OPINIONS OF THE EXPERT RETAINED BY [THE DIVISION].

Our scope of review on appeals from orders terminating parental rights is limited. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018). In such cases, we will generally uphold the trial court's factual findings, so long as they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Indeed, we give substantial deference to Family Part judges' special expertise and opportunity to observe the witnesses firsthand and evaluate their credibility, id. at 552-53, "and to gain a 'feel of the case' over time, thus supporting a level of factual familiarity that cannot be duplicated by an appellate

court reviewing a written record." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 220-21 (App. Div. 2013) (quoting E.P., 196 N.J. at 104). "We also defer to the trial court's assessment of expert evaluations." Id. at 221. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings are "so wholly unsupportable as to result in a denial of justice." P.P., 180 N.J. at 511 (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Even where the parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be accorded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552-53 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Guided by these standards, we are satisfied that the judge's factual

findings are amply supported by the credible evidence in the record, and his legal conclusions are sound. On appeal, defendant challenges the judge's findings on all four prongs of the best interests standard, arguing the Division did not provide defendant "with services that were specifically tailored to meet her needs" and thus did not make "reasonable efforts" as required under prong three to help her "remediate the circumstances that led to [C.D.B.'s] removal" and achieve reunification. Defendant posits that the services the Division provided were "woefully inadequate" and "lacked the requisite specificity and comprehensiveness needed to satisfy its legal obligation." Further, defendant asserts the judge "abandoned [his] statutory obligation to make an independent determination of whether alternatives to termination were considered." According to defendant, the Division's failure to meet its obligation under prong three caused the judge to err in its rulings under the remaining prongs. Additionally, defendant contends the judge gave "undue weight to . . . Katz's opinion[] that termination of [her] parental rights would not do more harm than good." We reject defendant's contentions as without sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(1)(E).

Suffice it to say, there is ample evidence in the record to support the judge's termination decision. See In re Guardianship of D.M.H., 161 N.J. 365,

393 (1999) ("The diligence of [the Division's] efforts on behalf of a parent is not measured by their success[,]" but "must be assessed against the standard of adequacy in light of all the circumstances of a given case."); N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007) ("Even if the Division had been deficient in the services offered to [the parent], reversal would still not be warranted, because the best interests of the child controls."). Admittedly, "[m]ental illness, alone, does not disqualify a parent from raising a child." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 450 (2012). "But it is a different matter if a parent refuses to treat [the] mental illness[ and] the mental illness poses a real threat to a child . . . ." Id. at 450-51. We agree with the judge that those circumstances were present here and "[i]t is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." Id. at 448-49.

Moreover, as public policy increasingly focuses on a child's need for permanency, it has resulted in the placement of "limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). To that end, the emphasis has "shifted from protracted efforts for reunification

A-1683-23

with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. (citing N.J.S.A. 30:4C-11.1). That is because "[a] child cannot be held prisoner of the rights of others, even those of [the child's] parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid. The question then is "whether the parent can become fit in time to meet the needs of the child[]." N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also P.P., 180 N.J. at 512 (observing that even if a parent is trying to change, a child cannot wait indefinitely); N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996) (holding that the "termination action was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the defendant's] inability to care for him in the foreseeable future").

Here, the judge carefully reviewed the evidence presented at trial, made copious findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. The judge reasonably determined that despite receiving services specifically tailored to meet her needs, defendant was unable to parent C.D.B., would not be able to do so for the foreseeable future, and any further delay of permanent placement would not be in the child's best interests.

The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law. See, e.g., F.M., 211 N.J. at 447-54; E.P., 196 N.J. at 102-11; K.H.O., 161 N.J. at 347-63; D.M.H., 161 N.J. at 375-94; N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 602-11 (1986). We see no basis to disturb the judge's findings on any of the best interests prongs.

Defendant notes in passing that the judge failed to resolve whether C.D.B. was "a Native American child" subject to the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963, and that there is no evidence the Division complied with the Act's requirements. Although the issue was raised at prior hearings before a different judge, the issue was never squarely presented at the guardianship trial. As such, the judge was never afforded an opportunity to make a ruling on the issue.

By way of background, the ICWA was enacted to preserve Native American families and limits a court's ability to remove Native American children from their families. N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368-69 (App. Div. 2015). The ICWA applies only to children who are members of, or eligible for membership in, a federally recognized Indian tribe. 25 U.S.C. § 1903. See K.T.D., 439 N.J. Super. at 370 (defining an "Indian child" as any unmarried person under age eighteen who is

16

either: "(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a [tribe] member" (quoting 25 U.S.C. § 1903(4))).

In any termination of parental rights proceeding, if the court knows or has reason to know that a child may be Native American, then the child's tribe must be notified. Id. at 369. If the child's tribe cannot be identified, then notice must be provided to the U.S. Department of the Interior, Bureau of Indian Affairs (BIA), that a guardianship proceeding is pending. Ibid.; see also 25 C.F.R. § 23.11(a), (b)(1) (requiring that notice sent to tribes also be sent to the BIA by registered or certified mail regardless of whether there is sufficient evidence to determine a child's putative tribe). "Once it receives an appropriate notice, the BIA must make reasonable efforts to locate and notify the appropriate tribe of the termination proceedings." K.T.D., 439 N.J. Super. at 373.

The purpose of the notice requirement is to provide the tribe with the opportunity to determine if the child in question is an "Indian child" as defined by the ICWA and for the tribe to determine whether intervention is warranted. Id. at 369. "Indian tribes have exclusive authority to determine who is a member of a tribe." Id. at 373. Among other things, the notice must include a copy of the guardianship complaint, information about the hearing, and the court's

contact information. See 25 C.F.R. § 23.111(d). A judgment that terminates parental rights can be set aside if notice was not given to a tribe or to the BIA, and failure to include the required information can be grounds for a remand. K.T.D., 439 N.J. Super. at 373-74.

Where there is any uncertainty about a child's Indian status, "'it is preferable to err on the side of giving notice' because '[i]t is impossible for a tribe to determine whether a child is a tribal member or eligible for membership if it never receives [notification] of the proceeding[s].'" In re Guardianship of J.O., 327 N.J. Super. 304, 315 (App. Div. 2000) (first and second alterations in original) (first quoting In re I.E.M., 592 N.W.2d 751, 757 (Mich. Ct. App. 1999); and then quoting In re J.T., 693 A.2d 283, 289 (Vt. 1997)). Although a conclusive showing of Indian ancestry is not required to trigger the ICWA's notice requirements, there is nothing unreasonable about a trial judge requiring "an affidavit" supporting a child's Indian status before requiring notification under the Act. J.O., 327 N.J. Super. at 316.

Here, J.B. advised Division workers and asserted at a 2022 court hearing that he was of Cherokee descent. As a result, the Division sent by certified mail notices to the United Keetowah Band of Cherokee Indians in Oklahoma, Eastern Band of Cherokee Indians, and Cherokee Nation to determine whether C.D.B.

was a member of those federally recognized tribes.[2] On June 2, 2022, the Eastern Band of Cherokee Indians responded that C.D.B. was not a member. Neither of the other two tribes responded but both acknowledged receipt of the notifications on May 31, 2022, through the certified mail receipts. The Division did not attempt further contact or notify the BIA.

Notwithstanding his prior assertions, on July 24, 2023, the first day of trial, J.B. testified under oath that C.D.B. was not eligible for membership in nor a biological child of a member of a federally recognized American Indian tribe. He reiterated this fact when he signed the Voluntary Surrender of Parental Rights Form the same day. Defendant presented no evidence to the contrary, nor did she request a ruling on whether the Division complied with the ICWA's notice requirements or whether there was sufficient evidence adduced to trigger notification under the ICWA. Nonetheless, out of an abundance of caution, we are compelled to remand the matter for the limited purpose of allowing the judge to address the issue.

---

[2] The three tribes the Division notified are the only three federally recognized Cherokee tribes. See Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 944 (Jan. 8, 2024).

To minimize the delay in securing permanency and stability for C.D.B., the judge shall resolve whether there is a sufficient showing to trigger notification under the ICWA and, if so, whether the Division complied with the Act's notice requirements. The judgment terminating parental rights shall be deemed affirmed if the judge determines, "after the tribes have been given an opportunity to intervene, that the ICWA does not apply to this matter." K.T.D., 439 N.J. Super. at 373.

> If [the child] is determined to be an Indian child under the ICWA, the judgment terminating parental rights shall be vacated and the trial court shall hold further proceedings consistent with the ICWA. All proceedings shall be conducted as expeditiously as practicable in accordance with the overarching goal of attaining permanency for [the child].
>
> [Ibid.]

Remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1683-23